435 So.2d 354 (1983)
STATE of Florida, Appellant,
v.
Cleo D. LeCROY and Jon M. LeCroy, Appellees.
No. 82-60.
District Court of Appeal of Florida, Fourth District.
July 27, 1983.
*355 Jim Smith, Atty. Gen., Tallahassee, Stewart J. Bellus and Marlyn Altman, Asst. Attys. Gen., West Palm Beach, for appellant.
James L. Eisenberg of Green, Eisenberg & Cohen, West Palm Beach, for appellee  Cleo D. LeCroy.
Michael Dubiner of Dubiner & Blumberg, West Palm Beach, for appellee  Jon M. LeCroy.
HERSEY, Judge.
The state appeals from an order which determined several pretrial motions adversely to the prosecution. Our recitation of facts will be limited to those essential to a review of the pertinent holdings of the trial court.
Appellees were indicted on five counts, three of which are material here.
Counts THREE and FOUR of the indictment, alleging robbery, were dismissed for failure "to allege the essential element of an intent to permanently deprive ... the respective owners of their property stolen therein."
Those counts provide:
COUNT THREE
The Grand Jurors of the State of Florida, inquiring in and for the body of said County of Palm Beach, upon their oaths do present that CLEO DOUGLAS LeCROY and JON MICHELE LeCROY on the 4th day of JANUARY, 1981, in the County of Palm Beach and State of Florida, unlawfully by force, violence, assault or putting in fear, did feloniously rob, steal and take away from the person or custody of another, to-wit: JOHN HARDEMAN, III, a 30.06 rifle and a wallet with good and lawful currency of the United States of America in denominations to the State Attorney unknown of the value of more than one hundred dollars, and in the course of committing the robbery was armed with a certain firearm or other deadly weapon, to-wit: a gun, contrary to Florida Statute 812.13(2)(a),
COUNT FOUR
The Grand Jurors of the State of Florida, inquiring in and for the body of said County of Palm Beach, upon their oaths do present that CLEO DOUGLAS LeCROY and JON MICHELE LeCROY on the 4th day of JANUARY, 1981, in the County of Palm Beach and State of Florida, unlawfully by force, violence, assault or putting in fear, did feloniously rob, steal and take away from the person or custody of another, to-wit: GAIL HARDEMAN, a .38 caliber revolver of a value of more than one hundred dollars, and in the course of committing the robbery *356 was armed with a certain firearm or other deadly weapon, to-wit: a gun, contrary to Florida Statute 812.13(2)(a), ... .
The "intent to deprive" is an essential element of the crime of robbery. Bell v. State, 394 So.2d 979 (Fla. 1981). While the counts in question do not contain the specific language "with the intent to deprive" they do contain an allegation that the property was taken "unlawfully by force," and that appellees did "feloniously rob, steal and take away" the items in question. These terms are sufficient to apprise appellees of the nature of the crimes of which they are accused and are clearly not "so vague, indistinct and indefinite as to mislead the accused and embarrass him in the preparation of his defense." Fla.R.Crim.P. 3.140(o). See Fountain v. State, 92 Fla. 262, 109 So. 463 (1926). "Indictments and informations should be upheld if they are in substantial compliance with the law." State v. Barnett, 344 So.2d 863, 865 (Fla. 2d DCA 1977). Accordingly, we hold that it was error to dismiss these counts of the indictment.
Count V was also dismissed; however, we find no error in that aspect of the order and therefore affirm in that respect.
Various defense motions to suppress statements and other evidence were considered by the trial court. As a result, five statements, two of Cleo Douglas LeCroy's and three of Jon Michele LeCroy's, were suppressed. If the sole test to be applied in appraising the voluntariness of these statements was the traditional one of whether the statements were in fact given voluntarily and without coercion or inducement, we would find them admissible. It is not enough, however, for the state to meet the challenge of factual voluntariness. In addition to being voluntary in fact, the statements must also have been legally voluntary; that is, the Miranda criteria must be met. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
As to both appellees, the Miranda warnings were read on more than one occasion. As to each, however, the following statement was also read (apparently under a police procedure for questioning a disinterested witness rather than the criminally accused):
This statement is taken primarily in order to refresh your memory at the time you may be called upon to testify, if and when this matter goes to court.
We have previously affirmed a conviction in a case involving similar language where the trial court found the statement voluntary in spite of this language. Knowles v. State, 407 So.2d 259 (Fla. 4th DCA 1981) (per curiam affirmed. Anstead, J., concurs specially with opinion). The trial court here came to a different conclusion and suppressed the statements. The first and primary requirement of Miranda is:
At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it  the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. [Emphasis added.]
384 U.S. at 467-468, 86 S.Ct. at 1624.
... .
The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system  that he is not in the presence of persons acting solely in his interest.
384 U.S. at 469, 86 S.Ct. at 1625.
The Miranda court was careful to point out that dilution of the warnings would not be tolerated. The opinion continues:

*357 Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.
384 U.S. at 476, 86 S.Ct. at 1628.
There can be no doubt that telling an individual during custodial interrogation that his statement is being taken primarily for the purpose of refreshing his recollection is a dilution of the Miranda warning and we hereby hold that it is a fatal one. We have little doubt that the statements would have been given without the prodding of this deception, but it is not a legitimate judicial function to permit speculation to stand as a substitute for constitutional rights. We, therefore, affirm suppression of the statements.
An additional impediment regarding the statements attributed to Jon LeCroy would have been rendered moot by our determination of the voluntariness issue except for the fact that it permeates another facet of the investigation; that is, the recovery of certain firearms. During the course of a car ride to Miami to recover these firearms, Jon LeCroy, who had been giving directions to the two detectives who accompanied him, asked for an attorney. At that point interrogation purportedly ceased; however, one of the detectives admitted that he continued to ask appellee for directions. Consequently, they arrived at a particular house in Miami and recovered the weapons. Miranda expressly prohibits such conduct.
If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.
... .
If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977.
384 U.S. at 474-475, 86 S.Ct. at 1627-1628. We, therefore, affirm suppression of the firearms recovered on that occasion. We also affirm suppression of the 38 caliber pistol as recovered under circumstances clearly activating the "fruit of the poisoned tree" doctrine. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
On this issue we offer a word in answer to the dissenting opinion: The purpose of the "inevitable discovery exception" to the exclusionary rule is to protect evidence obtained illegally where a concurrent legal investigation would assuredly have procured the identical evidence. Thus,
[t]he exclusionary rule does not come into play merely because the proffered evidence is in fact the product of an illegal act. If ... the illegal act merely contributed to the discovery of the allegedly tainted information and ... such information would have been acquired lawfully even if the illegal act had never transpired, the presumptive taint is removed, and the apparently poisoned fruit is made whole. In other words, if ... the illegal act was not an indispensable cause of the discovery of the proffered evidence, the exclusionary rule does not apply.
Maguire, How to Unpoison the Fruit  The Fourth Amendment and the Exclusionary Rule, 55 J.Crim.L., Criminology, and Police Sci. 307, 313 (1964).
In the instant case, while it is possible that the police could eventually have found the guns there is no evidentiary indication that they would have done so. Elliot's name was obtained only through the "involuntary" confession of Cleo and the location *358 of the .38 caliber pistol was shown by Jon only subsequent to his request for an attorney. Application of the inevitable discovery exception to these situations is simply too attenuated. There was no showing here that when the illegality occurred the police possessed or were actively pursuing other evidence or leads which would have led to the discovery of the challenged evidence and that there was a reasonable probability that such evidence would have thereby been discovered as required under United States v. Brookins, 614 F.2d 1037 (5th Cir.1980).
In summary, we reverse the dismissal of Counts THREE and FOUR of the indictment. In all other respects we affirm the extraordinarily complete and lucid order of the trial court.
AFFIRMED in part and REVERSED in part.
GLICKSTEIN, J., concurs.
ANDREWS, ROBERT LANCE, Associate Judge, dissents in part with opinion.
ANDREWS, ROBERT LANCE, Associate Judge, dissenting.
I concur in part of the majority opinion, but must in all due respect to my able colleagues, and the learned trial judge, dissent as to a portion of their findings and rulings.
As to Cleo D. LeCroy, the trial judge found as follows;
"Accordingly, this Court grants the motion and suppresses State's Exhibit 3 from evidence. Had it not been for the above quoted admonition, the Court would have denied the motion."
I have no quarrel with this holding, and would affirm the suppression of State's Exhibit 3. Knowles v. State, 407 So.2d 259 (Fla. 4th DCA 1981).
My disagreement is with the suppression of the shotgun and .22 calibre pistol taken from the LeCroy residence in Miami; and the 30.06 rifle from the Elliott residence in Miami on the night of January 11, 1981. The trial court granted the suppression on the basis of its ruling regarding the taped statement to Officer Browning (State's Exhibit 3), holding that these vital pieces of evidence were "fruits of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
A reading of those portions of the hearing transcripts reveal the following:

"DIRECT EXAMINATION
BY MS. VITUNAC:
Q State your full name, please sir.
A Kenneth Allen Welty.
Q Who were you employed by in January of 1981?
A Palm Beach County Sheriff's Department, Belle Glade Substation.
Q How long had you been in law enforcement, sir?
A Approximately 11 years.
Q During those 11 years, approximately how many homicide cases have you investigated, sir?
A I have been involved in approximately 40 to 50.

* * * * * *
DIRECT EXAMINATION (CONTINUED)
BY MS. VITUNAC:
Q You said you advised Cleo, Thomas and Jon LeCroy of their constitutional rights?
A Yes, I did.
Q From what form did you use, sir.
A The standard rights card.
Q And did each one sign that rights card?
A Yes, they did.
Q What time, approximately, did that occur?
A 10:10 a.m.

* * * * * *
DIRECT EXAMINATION (CONTINUED)
BY MS VITUNAC:
*359 Q Okay. Now, did there come a time when you transported Cleo LeCroy to the Belle Glade Substation?
A Yes.
Q Tell us the circumstances surrounding that, please, sir.
A I was instructed by Captain Fogleman that the individuals, LeCroy, complete family were suspects in this crime and he requested me to see if they would go to the sheriff's department for further questioning of this.
Q Okay. And based on that, what did you do, sir?
A I went to Mr. and Mrs. LeCroy, advised them that  I asked them to go to the sheriff's department for questioning. He made the comment, something like, `I know we are suspects now. I will be more than glad to go to clear ourselves, to show you we are not suspects.'
I asked the LeCroys if they wanted to take the boys with them in the pickup truck they were driving in. He told me he didn't want the boys around him, that it would be okay for the boys to drive with me.
Q Did you engage in any interrogation or questioning of either Cleo  well, of Cleo LeCroy, on the way to the Belle Glade Substation?
A Reference this case, none whatsoever.
Q Or any threats or promises or coercion of any kind offered to or given to this defendant on the ride to the Belle Glade Substation?
A No, there was not.
Q What happened when you got to the Belle Glade Substation, with respect to Cleo?
A I took Cleo into Sergeant Drigger's office.
Q And what 
A Let him sit down. The LeCroys were in the back of the building. I went to them and advised them that since Cleo was a juvenile, I request they be present when I questioned him and if it is all right if I question him.
He told me that he didn't want to be around them. He told me a few other things and he said that it would be fine for me to talk to him, because he just didn't want to be there.
Q What did you do after Mr. LeCroy told you that?
A I went and talked to Cleo. I read him his constitutional rights, advised him what his parents had said, that it would be all right for him to talk to me, if he wanted to. He stated that he wanted to. He kept insisting he had no knowledge of what had happened out there, he didn't know.
I talked to him for several more minutes and advised him that he needs to really think about what has happened and give him a couple of minutes to think. Then he says, `What if it was self-defense?'
I said, `Well, whatever it was, we need to find out what had happened,' and he started going into telling me what had happened.
Q Was this initial conversation on tape?
A No, it was not.
Q At what point did you reduce the conversation to a tape recording?
A At the point where he stated he was shooting at a hog and accidentally hit John Hardiman.
Q And what  when you got to that point, what happened?
A I stopped the interview, immediately, went to the rear of the building, got Detective Paul Copeland, to be present with me and at that time we went  I went back and started a taped statement.
MS. VITUNAC: All right.
THE COURT: I guess we marked the other tapes into evidence, didn't we? I think we did. I don't know.
MS. VITUNAC: This had been marked as State's Exhibit 2, for identification purposes.
THE COURT: Okay. Is that tape as clear as the other tapes?
MS. VITUNAC: Yes, sir.
*360 THE COURT: All right. I am going to do like I did before and that is have the Court Reporter record it as I go along, so I will have a record of it, when I review these transcripts, without having to Listen to these.
THE CLERK: State's Exhibit Number 2 for identification purposes only.
(Whereupon, the above referred to tape was marked State's Exhibit Number 2, for identification purposes only.)
DIRECT EXAMINATION (CONTINUED)
BY MS. VITUNAC:
Q I show you what has been marked as State's Exhibit Number 2 in evidence, without objection.
THE COURT: Mr. Court Reporter, take this down.
THE WITNESS: Should I turn this on to where I am at or do you want me to start it at the very beginning?
THE COURT: It is all right with me.
`Detective Welty: Today's date is January 11, 1981. Present is Palm Beach County Sheriff's Detective Paul Copeland, Detective Kenneth Welty.
What is your name, sir?
`The Witness: Cleo Douglas LeCroy.

`Detective Welty: And what do they call you?
`The Witness: Either one, Cleo or Doug.
`Detective Welty: Okay, I am going to read you your constitutional rights, just like I read to you today at 10:10 a.m., okay, out at Brown's Farm Hunt Area.
I am required to warn you, before you make any statement, that you have the following constitutional rights: You have the right to remain silent and not answer any question. Any statement you make must be freely and voluntary given. You have the right to the presence and representation of a lawyer of your choice before you make any statement and during any questioning. If you cannot afford a lawyer, you are entitled to the presence and representation of a court-appointed lawyer, before you make any statement and during any questioning. If, at any time during the interview, you do not wish to answer any questions, you are privileged to remain silent. I can make no threats or promises to induce you to make a statement. This must be of your own free will. Any statement can and will be used against you in a court of law.
Do you understand that?
`The Witness: Yes, sir.
`Detective Welty: All right. That is the second time they have been read to you today; correct?
`The Witness: Correct.
* * * * * *
`Detective Welty: Okay. I think it would be best of all and unless you have got any other questions, we will end it right now and if there is anything at all, let myself or Detective Copeland, let them know and we will get it back on tape and we will discuss it. Okay?
`The Witness: Well, right now I am nervous. I can't even think straight right now.
`Detective Welty: Okay, we are going to end this statement at 2:20 p.m., January 11, 1981.'
Q After the taking of this statement, what did you do?
A I went to the rear of the building. I talked to Mr. and Mrs. LeCroy, advised them of what Cleo had told me and how many times he had changed his story, in variations.
We  myself and several officers made contact with Assistant State Attorney Michael Miller and were told to charge them with two counts of first degree murder and two counts of robbery and at that time, I went and talked to Jon LeCroy, briefly.
Detective Browning was, at that time, just starting to take another statement from Cleo.
Just prior to the statement I went back and advised Cleo LeCroy that he was under arrest for two counts of first degree murder and two counts of armed robbery.
*361 Q And after that point, Detective Browning took a statement from Cleo LeCroy?
A That is correct.
Q After the statement that Browning took from Cleo LeCroy, what happened?
A The best I can remember, Detective Browning told me that Cleo had admitted he had taken the Hardiman's guns. One gun was a 30.06 Smith and Wesson rifle that he had taken to a boy's house in North Miami, by the name of Ellit and he had taken the .38 caliber Smith and Wesson Pistol and given it to his brother, in Miami.
Q So, what did you do?
A I, at that time, went to the LeCroys and advised them where the victims were at and that the weapons belonging to Cleo and Jon were at the house and asked if they went  if we went to Miami to get the weapons, hold them for evidence, check for ballistics. Mr. LeCroy said he didn't mind.
I, at that time, went and talked to Jon, who I believe was with Detective Paul Copeland and asked him if he would voluntarily turn up his rifle, which was an 8-millimeter-military-Mauser-type rifle. He stated he wanted us to check for ballistics and show that he didn't shoot anyone.
Q What did Cleo say about allowing anyone to go get his weapons, the .22 and the shotgun?
A He stated that it would be all right. He wanted to turn them over, because he knew sooner or later it would come up.

* * * * * *

DIRECT EXAMINATION
BY MS. VITUNAC:
Q State your full name, please sir.
A Richard Arnold Browning.
Q By whom are you employed?
A Palm Beach County Sheriff's Department.
Q In what capacity, sir?
A Agent.
Q Did you become involved in the search for the Hardiman couple during the month of January, 1981?
A I did.
Q What was your capacity in that investigation, sir?
A I handled the investigative end of it and Lieutenant Mills handled the search end.
Q Were you the case detective on that case?
A Yes, I was.
Q Did you have occasion to speak with Cleo LeCroy on January 11th, 1981?
A Yes, I did.
Q At what time did you speak with Cleo LeCroy on the 11th?
A I think I spoke to him just briefly that morning, the early morning hours when he first arrived at the Brown's Farm Area, as must as saying, `Hello, how are you?' That type of thing.
Q Did you have occasion to take a taped statement from Cleo LeCroy on the 11th of January, 1980?
A I did.

* * * * * *
Q Okay. Now, what time did you leave the Brown's Farm Area and go back to the Belle Glade Substation?
A I left the Brown's Farm Area approximately 4:00 o'clock.
Q What did you do?
A Well, no. Correction. On that, it was probably closer to 3:00 o'clock.
Q Okay. Did there come a time, on the 11th, after 4:00 o'clock in the afternoon, when you spoke to Cleo LeCroy?
A Ask me that again, please?
Q Did there come a time on the 11th, when you spoke to Cleo LeCroy, after 4:00 o'clock in the afternoon?
A Yes, I did. I spoke to him at 5:00 o'clock that afternoon.
Q All right. What were the circumstances surrounding your talking to Cleo LeCroy that afternoon?
*362 A All right. I had been in an interview with Detective Copeland, with Jon LeCroy. I don't recall exactly who  I had been made aware that Detective Welty had been taking a statement from Cleo, which I didn't go in the room while this was going on, but anyway, somebody brought it to my attention that Cleo had asked to talk to me and when I went in, it was  he made it known to me that he wanted to talk to me, by myself. He didn't want anybody else in the room.
Q How did he make that known to you?
A He said it. He just came out and said it.
Q What did you do when he said, `I want to talk to you and I want to talk to you alone?'
A I had everybody else leave and advised him of his rights and we started talking.
Q Was that on tape?
A The initial interview was not on tape, but I did take a taped statement.
Q What did you discuss in the initial interview?
A Basically the same thing that we discussed on the tape.
* * *"
It appears to this writer that from the testimony of these officers that the obtaining of State's Exhibit 3 was nothing more than ritualistic formality  all the facts had been legally obtained prior to the error committed in State's Exhibit 3.
There being no "fruit of the poisonous tree" the trial court erred in suppressing the weapons.
As to Jon M. LeCroy and the .38 caliber pistol, assuming arguendo, that the asking of directions after the invocation of his right to an attorney was a violation of Miranda, I am of the firm opinion that its discovery falls into the Inevitable Discovery Exception to the Exclusionary Rule.
The exclusionary rule enunciated by Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) requires the suppression of any evidence that is either the direct or indirect product of illegal police conduct. A court will admit such "fruits of the poisonous tree", however, if the prosecutor established that:
(1) The connection between the challenged evidence and the illegal conduct has become so attenuated as to dissipate the taint of the illegal action,
(2) The evidence was obtained from a source independent of the primary illegality, or
(3) The evidence inevitably would have been discovered in the course of the investigation.
It is the third exception, the Inevitable Discovery Exception to the Exclusionary Rule, upon which I would reverse the able trial judge's decision to suppress the .38 caliber pistol. The inevitable discovery rule was given the spark of life in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). See footnote 12, page 406, 97 S.Ct., footnote 12, page 1243.
In United States v. Brookins, 614 F.2d 1037, 1044 (5th Cir.1980), the Circuit Court very cogently set forth the principle underlying this exception when it stated:
"The exclusionary rule does not come into play merely because the proffered evidence is in fact the product of an illegal act. If ... the illegal act merely contributed to the discovery of the allegedly tainted information and ... such information would have been acquired lawfully even if the illegal act had never transpired, the presumptive taint is removed, and the apparently poisoned fruit is made whole. In other words, if ... the illegal act was not an indispensable cause of the discovery of the proffered evidence, the exclusionary rule does not apply."
* * * * * *
"... Decisions of this circuit have applied the principles on which this exception rests but in a slightly different context. In Gissendanner v. Wainwright, 482 F.2d 1293 (5th Cir.1973), an illegally obtained confession provided the identities of two accused rapists and accounted for their *363 presence in a lineup identification. The lineup and subsequent convictions were valid, however, because the rapists' identities would probably have been discovered subsequently during ordinary investigations.
Certainly, before any consequences so destructive of society's right to be protected from violent crimes (are) to be set in motion, there would have to be a respectable showing that (i) it was solely through such invalid source that identity was ascertained and (ii) there was no likelihood that it would have subsequently been discovered through other police efforts. In summary, there is no showing on this record ... that in the normal police work investigation their identities would not have turned up. Id. at 1297 (emphasis added.)"
The Brookins decision (supra) placed the burden of proof upon the prosecution when it stated:
This approach does not mean that any illegally obtained evidence can be admitted simply because law enforcement officials assert that it would have been inevitably discovered. The mere assertion of inevitable discovery must fail. After the accused has challenged the legality of the witness' acquisition and of the use of the witness's testimony, the police must show that when the illegality occurred they possessed and were actively pursuing the evidence or leads that would have led to the discovery of the challenged witness and that there was a reasonable probability that that witness would have thereby been discovered. The prosecution must bear the burden of proof on this issue. Maguire, supra at 315; see Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court then must find that reasonable probability of subsequent discovery existed based on this showing and the record generally.
Convinced as I am, that the Police had obtained the location of the weapons prior to the taking of State's Exhibit 3 from Cleo LeCroy, I am even more convinced that the Palm Beach County Sheriff's Office could have found Miami and ultimately the weapons without Jon LeCroy's directions.
I would reverse as to the suppression of all the weapons.