533 So.2d 750 (1988)
Cleo Douglas LeCROY, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 69484.
Supreme Court of Florida.
October 20, 1988.
Rehearing Denied December 15, 1988.
*752 Charles W. Musgrove, West Palm Beach, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen. and Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, for appellee/cross-appellant.
SHAW, Justice.
Cleo Douglas LeCroy appeals his convictions on two counts of first-degree murder and two counts of robbery with a firearm. He also appeals a sentence of death on one count of first-degree murder and sentences of thirty-years' imprisonment on each robbery count with a minimum mandatory of three years. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The victims, John and Gail Hardeman, husband and wife, failed to return home from camping and hunting in a wild area of Palm Beach County on 4 January 1981. An intensive search was initiated. Their bodies were not found until 11 January 1981. John had died from a single shotgun slug to the head. His wallet and a .30-06 hunting rifle were missing. Gail's body was found approximately 400 feet away. A .38 revolver belonging to her was missing, her trousers were unzipped and her brassiere was partially dislocated. She died from three small caliber gunshots to the chest, head and neck. Appellant Cleo, his brother Jon, and their parents, who were camping nearby during the weekend of the disappearance, assisted in the search. During the search, appellant Cleo and Jon professed to be great trackers who could find the bodies if the police would let them search alone and Cleo speculated to search members on various scenarios concerning what happened to the victims. In addition, Cleo discovered a backpack and cushions belonging to the victims which could not be seen by other searchers present with him. The first body, Gail's, was discovered by Jon, in the company of police officers. Immediately after the discovery of the bodies, Cleo and Jon were questioned. Appellant Cleo received and waived his Miranda[1] rights and gave two inculpatory statements to the police. In his first statement, he claimed to have killed John by accident with his shotgun while shooting at a hog. According to Cleo, the "slug" ricochetted around. He claimed to have killed Gail, without knowing who she was, when she burst on the scene. During the course of the statement, he changed the story to say that Gail shot at him first and, also, that he killed her to eliminate a witness. He denied going near or touching the bodies and claimed to have left immediately without taking the victims'.30-06 rifle and .38 revolver. Cleo said he told his brother Jon about the killings and where the bodies were that same day, but denied *753 Jon was present at, or had anything to do with, the killings.
After giving this first statement, Cleo almost immediately asked to speak to a second officer to correct his earlier story. He again received and waived his Miranda rights. This time he admitted taking the victim's guns and said he unzipped Gail's trousers to check for a pulse but denied any sexual molestation. He said he shot her three times with his .22 caliber pistol when she came up yelling after he shot John. He again said he told his brother Jon about the killings and the approximate location of the bodies on the day of the killings, and again on the day the bodies were discovered, but denied that Jon had anything to do with the crimes. Cleo said he first hid the guns near the campsite, later retrieved them, and gave the rifle to a friend and the revolver to Jon.
Cleo's girlfriend corroborated his statements. She said that Cleo told her on 3 January about taking a gun from a hunter at the campsite that day and returning it before it was missed. She testified that she arrived at the campsite during the morning of the 4th and that Cleo was out hunting and Jon was in camp. When Cleo returned that afternoon, he told her of killing John and, later, of killing Gail. The details of the killings were consistent with Cleo's statements to the police and the physical evidence from the autopsies. She said Cleo retrieved the rifle and revolver from their hiding place and later sold the rifle to an acquaintance. The police retrieved the rifle from the acquaintance who confirmed he bought the rifle from Cleo during the week following the killings and that he had earlier, well prior to the killings, discussed buying a .30-06 from Cleo. Cleo also told the girlfriend that he took John's wallet and money. She also testified that Cleo said he had blood on his pants and burned the pants. She testified that Cleo later told her he was going to mutilate the barrel of his .22 to prevent identification and that he wanted to cut the bullets out of the bodies to prevent identification. Weapons experts later testified that the barrel had been mutilated. There was also testimony from a jailmate of Cleo's that Cleo admitted the killings. Contrary to Cleo's statements, the medical examiner testified that the shots which killed Gail were fired at point blank range and in two of them the gun was probably in contact with her body. Again, contrary to Cleo's statements that he killed Gail when she burst on the scene, and did not move the bodies, the two bodies were found approximately 400 feet apart, separated by brush and other growth which prevented visual sighting between the two scenes.
Appellant raises eight issues challenging the convictions and sentences. He first argues that we should revisit our earlier ruling in State v. LeCroy, 461 So.2d 88 (Fla. 1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985), where we held that his second statement to the police was admissible. We decline to do so. Moreover, having now received and reviewed the full record of the trial, it is clear beyond a reasonable doubt that admission of this second statement, even if error, did not impact on the jury verdict. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). The second statement attempted to correct certain patently false details given by Cleo in his first statement, e.g., that he had not taken the victims' guns and had not touched Gail after the killing. In a variation on this issue, appellant now argues that the playing to the jury of the taped confession containing the advice that the statement was being taken to refresh his memory in the event he was called on to testify at trial was a comment on the exercise of his right to remain silent at trial. We do not agree that this pretrial refresher advice is fairly susceptible of being interpreted as a comment on the failure to testify at trial. State v. Kinchen, 490 So.2d 21 (Fla. 1985). We also note that appellant declined the state's offer to excise this portion of the tape because appellant believed that the jury should hear it in order to weigh voluntariness.
Appellant also argues that we should revisit an issue resolved by the district court below in the earlier interlocutory appeal. In State v. LeCroy, 435 So.2d 354 *754 (Fla. 4th DCA 1983), the district court held that the charge on the robbery counts was sufficient to apprise appellant of the nature of the crimes charged and did not mislead or embarrass appellant in the preparation of a defense. We decline to revisit this issue which became the law of the case with the holding below. Preston v. State, 444 So.2d 939 (Fla. 1984).
Appellant Cleo and brother Jon were indicted as codefendants in these crimes. Prior to trial, both defendants moved for severance and jointly represented to the court that Cleo wished to testify in exculpation at Jon's trial if it were held separately, but could not do so if they were jointly tried. The court granted a severance and Jon was tried following the trial here. However, at his own trial, Cleo attempted to develop a defense which placed the responsibility for the crimes, in whole or part, on Jon.[2] He now argues that the trial court erred in refusing to admit hearsay evidence that Jon told others that he had seen dead bodies before and was the last to see the victims alive which, appellant urges, is a statement against interest within the meaning of section 90.804(2)(c), Florida Statutes (1979). Concerning the statement that Jon saw the victims last, this is based on the testimony of a witness that Jon said he saw the victims at 11 a.m. the day of the murder and the testimony of another witness that Cleo told him he last saw the victims at approximately 10:30 a.m. Thus, appellant reasons, Jon made an admission against interest by saying he saw the victims after Cleo. We do not agree that a hearsay statement by Jon that he saw the victims at 11 a.m. is an admission against interest. Another witness testified he saw Cleo with the victims around 10 a.m. and Cleo admitted in his statement to the police that he had conversed with the victims that morning, for approximately twenty minutes, that they had separated, and that the killings occurred later after a period of hunting. As to Jon saying that he had seen dead bodies before, the statement is meaningless without further development and could only have been developed by calling Jon as a witness. The state points out that had this been done, the state would have been able to elicit Jon's statement to the police that he had seen the victims bodies shortly after Cleo killed them. This would have been consistent with Cleo's statements to the police that he told Jon of the killings, and the approximate location of the bodies, shortly after the crimes. We see no error. Moreover, as the state argues, even if it was error, the error was clearly harmless. Evidence showing that Jon had also been indicted and had some role in either the crimes or in attempting to conceal the crimes was given to the jury.[3] We do not see how this ambiguous hearsay could have affected the verdict.
Relying on State v. Hegstrom, 401 So.2d 1343 (Fla. 1981), appellant argues that it was error to sentence him on both the felony murder and robbery of John Hardeman. Appellant has overlooked State v. Enmund, 476 So.2d 165 (Fla. 1985), where we overruled Hegstrom and held that sentences on both felony murder and the underlying felony were appropriate.
Relying on Palmer v. State, 438 So.2d 1 (Fla. 1983), appellant argues that it was error to impose minimum mandatory sentences of three years on each of the two robbery convictions. In State v. Thomas, 487 So.2d 1043 (Fla. 1986), we held that the trial court had discretion to impose consecutive minimum mandatory sentences for separate offenses which, unlike those in Palmer, were not simultaneously committed. The uncontradicted evidence here was that appellant first killed and robbed John Hardeman and, after an indeterminate lapse of time, killed and robbed Gail Hardeman when she arrived on the scene. Thus, this case is controlled by Thomas not Palmer.
Appellant's final three challenges are to the imposition of the death penalty *755 for the murder of Gail Hardeman. The jury was given special verdict forms during the guilt phase of the trial. It specifically found appellant guilty of first-degree felony murder in the murder of John and of first-degree premeditated murder in the murder of Gail. This distinction was based on the evidence which tended to show that John was murdered as part of a robbery and that Gail was murdered in order to silence a witness. Appellant argues that the judge erred in receiving victim impact evidence, contrary to Booth v. Maryland, ___ U.S. ___, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). After the jury recommendation of death, the judge agreed, over objection, to hear victim impact evidence from the relatives of the victims. The judge, at the time, did not have the benefit of Booth or of Grossman v. State, 525 So.2d 833 (Fla. 1988), and determined that the provisions of section 921.143, Florida Statutes (1985), gave the relatives the right to be heard. In doing so, however, the judge correctly recognized that this evidence was not a statutorily authorized aggravating factor, and advised the relatives, and the parties that his decision on aggravation would be limited only to statutory aggravating factors. It is thus clear that the victim impact statement played no role in the judge's sentencing order. We agree that it was error to hear the evidence in light of the subsequent decisions in Booth and Grossman, but find that the error was harmless in that it was not presented to the jury and was not used by the judge in imposing the death penalty. Grossman; DiGuilio. In a similar vein, appellant argues that the prosecutor committed reversible error in commenting on pity and sympathy for the victims in his closing argument during the penalty phase. The trial court sustained the objections and instructed the prosecutor to get off the subject of pity and sympathy. We see no reversible error.
The jury was instructed that it could find the aggravating factors of prior convictions for a violent felony and murder committed during the course of a robbery in the murder of John. In the case of Gail, the potential aggravating factors were expanded to include elimination of a witness. The jury apparently weighed the distinctions between the two murders: it recommended life for the murder of John and death for the murder of Gail. These recommendations were consistent with the distinction the jury drew in rendering its special verdicts on guilt. The trial judge agreed with the jury recommendation on both murder counts. In his sentencing order on the Gail murder, the judge found three aggravating factors: (1) previous conviction of another capital felony or of a felony involving the use or threat of violence to the person;[4] (2) capital felony committed while the appellant was engaged in the commission of robbery with a firearm;[5] and (3) capital felony committed for the purpose of avoiding or preventing a lawful arrest.[6] Appellant challenges all three aggravating factors. We disagree. Factor one is supported by the prior convictions for the murder and robbery of John. Contrary to appellant's arguments, contemporaneous prior convictions involving another victim may be used as aggravation. Craig v. State, 510 So.2d 857, 868 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); Wasko v. State, 505 So.2d 1314, 1317 (Fla. 1987). Factor two is supported by appellant's two convictions for robbery with a firearm of each victim. Factor three is supported by the jury's special verdict that the murder of Gail was premeditated and by appellant's admissions that she was killed to prevent her from reporting the murder of John. In mitigation, the judge found: (1) that appellant had no significant history of prior criminal activity, and (2) that the appellant was seventeen years of age at the time of the murder. The trial court gave great weight to the second mitigating factor but found that the evidence showed that appellant was mentally and emotionally mature and that he understood the distinction between right and wrong and the nature and *756 consequences of his actions. The trial judge also considered various other nonstatutory mitigating factors but found that the aggravating factors outweighed the mitigating factors and that death was the appropriate penalty.
Appellant raises sixteen points challenging the constitutionality of Florida's death penalty statute as applied to him. He concedes that fifteen of these points have been previously decided contrary to his position. We see no reason to replough this familiar ground. Appellant's final argument is that imposition of the death penalty is cruel and unusual punishment for a seventeen-year-old. In support, appellant argues: (1) that minors have less capacity to control their conduct and that imposition of the death penalty on minors does not serve the goals of deterrence and retribution because of immaturity; (2) that the law generally recognizes the immaturity of minors and treats them differently; (3) that juries are reluctant to impose the death penalty on minors and it is seldom imposed; and (4) that even though the United States Supreme Court now has this issue before it, we should issue a definitive ruling.
We note, first, that the sentencing judge gave great weight to appellant's youth but nevertheless found that he was mentally and emotionally mature and understood the difference between right and wrong and the nature and consequences of his actions. Florida law generally recognizes distinctions between juveniles and adults but section 39.02(5)(c), Florida Statutes (1979-1987), mandates that a child of any age charged with a capital crime "shall be tried and handled in every respect as if he were an adult." (Emphasis supplied.) The words "every respect" could not be clearer and can only be read as a declaration of legislative intent that persons under eighteen years may be subject to the same penalty as an adult. This has been the long-standing law in Florida. Prior to 1950, the Florida Constitution vested jurisdiction over all criminal charges against juveniles in criminal courts, i.e., not in juvenile courts, and all juveniles were tried as adults. The constitution was amended in 1950 to authorize the legislature to confer criminal jurisdiction on cases involving juveniles in juvenile courts.[7] The legislature responded by enacting chapter 26880, section 1, Laws of Florida (1951), codified as chapter 39, Florida Statutes (1951). Under chapter 39, jurisdiction for violations of law allegedly committed by a child, then defined as a person under seventeen years of age, was removed from criminal courts and placed in either juvenile courts or county courts in those counties where no juvenile court existed. §§ 39.01, .02, Fla. Stat. (1951). Section 39.02(6), Florida Statutes (1951), granted discretion to the juvenile court to transfer felony charges against children fourteen years of age or older to criminal courts, except "that a child sixteen years of age or older who, if an adult, would be charged with a capital offense, shall be transferred." (Emphasis supplied.) Since 1951, the legislature has steadily expanded the transfer of criminal charges from juvenile to criminal courts and has, similarly, expanded and reiterated its decision that juveniles charged with capital offenses be tried and handled as adults.
In 1955, the legislature amended section 39.02(6) by deleting "sixteen years or older" and providing that any child, irrespective of age, indicted by a grand jury for an offense punishable by death or life imprisonment shall be tried in criminal court.[8] Section 39.02(6) was further revised, and legislative intent made even clearer in 1967 and 1969 by providing:
(c) When an indictment is returned by the grand jury charging a child of any age with a violation of Florida law punishable by death, or punishable by life imprisonment, the juvenile court shall be without jurisdiction, and the charge shall be made, and the child shall be handled, in every respect as if he were an adult.

*757 § 39.02(6)(c), Fla. Stat. (1969) (emphasis supplied).
In 1973, the legislature substantially rewrote chapter 39. Exclusive original jurisdiction of charges against juveniles was returned to the circuit court and provisions were made whereby the court could try any child fourteen years of age or older as an adult on any criminal charge. A child was also redefined as any person under eighteen years of age. Ch. 73-231, §§ 2, 3, Laws of Fla. (1973). In 1978, the legislature rewrote and recast section 39.02, providing that a child once tried as an adult would thereafter be subject to prosecution, trial, and sentencing as an adult for any subsequent criminal violations. Ch. 78-414, § 3, Laws of Fla. (1978). Finally, in 1981, the legislature further amended the recast 39.02(5) by providing that trials of offenses punishable by death or life imprisonment would include trials of any other criminal violations connected with the primary offense. Further, if convicted of the offenses punishable by death or life imprisonment, "the child shall be sentenced as an adult." Ch. 81-269, § 1, Laws of Fla. (1981) (codified at § 39.02(5)(c), Fla. Stat. (1981)).
Several points are clear from the legislative history recounted above. First, legislative action through approximately the last thirty-five years has consistently evolved toward treating juveniles charged with serious offenses as if they were adult criminal defendants. Second, since 1951, the legislature has repeatedly reiterated the historical rule that juveniles charged with capital crimes will be handled in every respect as adults. Whatever merit there may be in the argument that the legislature has not consciously considered and decided that persons sixteen years of age and younger may be subject to the death penalty, and that issue is not present here, it cannot be seriously argued that the legislature has not consciously decided that persons seventeen years of age may be punished as adults. If section 39.02(5)(c) does not apply to the oldest age encompassed by the term of art, child, it does not apply to any age and all the legislative activity on this subject had no purpose or intent. That proposition can only be rejected.
Finally, in response to appellant's arguments, we note that the jury here recommended death for the premeditated murder of Gail Hardeman but was able to distinguish between this more aggravated murder and that of her husband, for which it recommended life imprisonment. This reflects a community judgment that in this particular case, under these circumstances and for this defendant, the death penalty is appropriate. Section 921.141(6)(g) recognizes age as a possible mitigating factor. Cases cited by appellant for the proposition that Florida seldom imposes the death penalty on minors indicate only that minors convicted of first-degree murder tend to exhibit immaturity or other mitigating characteristics which persuade juries and sentencing judges that the death penalty is inappropriate in their specific cases. Echols v. State, 484 So.2d 568, 575 (Fla. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986); Agan v. State, 445 So.2d 326, 328 (Fla. 1983), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); Peek v. State, 395 So.2d 492, 498 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). They do not show that there is a per se rule against imposing the death penalty on minors.
Since this case was presented to us, the United States Supreme Court has released its opinion in Thompson v. Oklahoma, ___ U.S. ___, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), holding that the death penalty would not be applied to a murderer who was fifteen years old when he committed the offense. Although the Court's decision offers no definitive guidance in this case, we have nevertheless reviewed the various opinions filed in Thompson. We note the following which distinguish this case from Thompson and Florida's death penalty system from that of Oklahoma. First, the appellant here, at seventeen years ten months of age, was approximately two years older than Thompson when he committed this offense. Second, section 39.02(5)(c) specifically provides that a child of any age indicted for a crime punishable *758 by death or life imprisonment "shall be tried and handled in every respect as if he were an adult." See discussion above. Third, point two is reinforced by the Florida Legislature's decision that age should be a statutory mitigating factor. This indicates that the legislature intended that youth and its potential characteristics be considered as a factor by the jury and the sentencing judge in determining whether a youthful defendant should be subject to the death penalty. It does not suggest an intention to draw an arbitrary bright line between those who are eighteen years of age and those, such as here, who are seventeen years of age. Fourth, the sentencing judge specifically considered appellant's age but found him to be mentally and emotionally mature. This decision was consistent with the jury's advisory recommendation of death which was also reached after considering appellant's age and potential immaturity. It appears then that the legislature has specifically decided that some seventeen-year-olds may be sentenced to death and that the jury and judge in this particular case have decided that this appellant should be sentenced to death. We do not consider this to be a definitive resolution of whether there is some irreducible minimum age below which the death penalty may never be imposed. As the Thompson court did, we limit our decision to the case at hand and hold that there is no constitutional bar to the imposition of the death penalty on defendants who are seventeen years of age at the time of the commission of the offense.
The state argues on cross-appeal that the trial court erred in not admitting hearsay testimony concerning an admission by silence by appellant. A trial court has wide discretion in ruling on the admission of evidence. We see no abuse of discretion. Welty v. State, 402 So.2d 1159, 1162 (Fla. 1981).
We affirm the convictions and sentences.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion.
BARKETT, Justice, concurring in part, dissenting in part.
I concur with the majority's result as to guilt. As to the sentence, I believe that imposing the death penalty on one who was a child at the time of the crime violates the eighth amendment to the federal constitution[1] and article I, section 17 of the Florida Constitution. Under Florida's death penalty statute, the ultimate punishment of death is reserved for the most aggravated and indefensible of crimes committed by the most culpable of offenders. See State v. Dixon, 283 So.2d 1, 8 (Fla. 1973), cert. denied sub nom. Hunter v. Florida, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). I believe the death penalty is totally inappropriate when applied to persons who, because of their youth, have not fully developed the ability to judge or consider the consequences of their behavior. This conclusion particularly is strong in light of the legal disabilities imposed upon minors because of their lack of mature judgment.
As the plurality also recognized in Thompson, 108 S.Ct. at 2692-93, the United States Supreme Court has repeatedly pointed out that "[o]ur history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults." Eddings v. Oklahoma, 455 U.S. 104, 115-16, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982). The Court in Eddings noted that
"[A]dolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, *759 youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth."
Id. at 115 n. 11, 102 S.Ct. at 877 n. 11 (quoting Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978)) (emphasis supplied).
I am confident that most reasonable persons would agree that the death penalty cannot be imposed on children below a certain age. As Justice O'Connor noted, every member of the United States Supreme Court participating in the Thompson decision agreed that "there is some age below which a juvenile's crimes can never be constitutionally punished by death." 108 S.Ct. at 2706. Differences arise only as to the age which should be the line of demarcation. In my view, that line should be drawn where the law otherwise distinguishes "minors" from adults. In Florida, this defendant would fall below that line.
Florida law protects seventeen-year-olds and those who are younger, treating them as "minors" and "children," see sections 1.01(14), 39.01(7), Florida Statutes (1987), not as mature adults capable of exercising judgment or discretion. For example, an unmarried seventeen-year-old such as appellant cannot vote, § 97.041, Fla. Stat. (1987), serve on a jury, § 40.01, Fla. Stat. (1987), or purchase or possess alcoholic beverages, § 562.11, Fla. Stat. (1987). Nor may he or she attend jai alai or a dog race, compare § 550.04 with § 551.03, Fla. Stat. (1987), dispose of property by will, § 732.501, Fla. Stat. (1987), enter into a contract, compare § 743.01 with § 743.07, Fla. Stat. (1987), or sue or be sued. Compare § 743.01 with § 743.07, Fla. Stat. (1987). Without parental consent a seventeen-year-old may not marry, § 741.0405, Fla. Stat. (1987), and without either parental or judicial consent, a seventeen-year-old may not obtain an abortion. § 390.001(4)(a), Fla. Stat. (1987).
When a government withholds the right of a citizen to enjoy certain benefits and privileges because of immaturity and lack of judgment, then for the same reason it also should withhold the imposition of the ultimate and final penalty, which can be imposed only where there is heightened culpability. I cannot agree, as the majority implicitly holds, that one whose maturity is deemed legally insufficient in other respects should be considered mature enough to be executed in the electric chair.
Finally, I disagree with the majority's analysis of Thompson. Looking purely at the broadest grounds upon which a majority of the Thompson court agreed[2] and upon this nation's death penalty jurisprudence, I do not believe the legislature has given a constitutionally proper degree of consideration to the execution of children. While it may be true that the "legislature has ... consciously decided that persons seventeen years of age may be punished as adults," maj. op. at 757, this conclusion in and of itself does not mean that all constitutional hurdles have been cleared when the penalty in question is death.
The majority fails to take account of what the United States Supreme Court repeatedly has held, that death is qualitatively different from every other punishment, requiring extraordinary statutory and procedural safeguards. Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Eddings, 455 U.S. at 111, 102 S.Ct. at 874; Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). I believe Thompson *760 stands for the proposition that this requirement is especially strong when we are confronting the execution of a child.
As Justice O'Connor noted in her concurrence to Thompson, 108 S.Ct. at 2711 (O'Connor, J. concurring in judgment), imposing death on children less than sixteen years of age requires "the earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty." Moreover, Justice O'Connor specifically found that death could not be imposed upon one under sixteen years of age "under the authority of a capital punishment statute that specifies no minimum age at which the commission of a capital crime can lead to the offender's execution." Id.
Admittedly, the Thompson court did not reach the question of whether execution is proper for a child between the ages of sixteen and eighteen. Nevertheless, I see no reason why Justice O'Connor's criticisms of the Oklahoma statute are not equally applicable to section 39.02(5)(c), Florida Statutes, and to this case. Although appellant was seventeen at the time of the offense, he nevertheless was sentenced under a statute that sets no minimum age below which death is improper and that reflects none of the "careful consideration" expected of other death penalty statutes since the early 1970s. The extensive legislative history cited by the majority simply does not supply these missing elements.
Much of that history, indeed, predates the Supreme Court decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (plurality opinion), which invalidated death penalty statutes that did not sufficiently guide sentencing discretion. Furman specifically criticized the then-existing death penalty statutes because they afforded "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." Id. at 313, 92 S.Ct. at 2764 (White, J. concurring).
My concern, however, is not merely based on the fact that much of this legislative history predates Furman. Looking purely at the language of section 39.02(5)(c) and the death penalty statute itself, I can discern in them no meaningful basis by which we as a Court can distinguish between those cases in which the execution of children is presumed to be proper and those in which it is not, assuming arguendo that the execution of children over a certain age ever can be permissible. This lack of a standard itself suggests arbitrariness and a failure to channel sentencing discretion according to factors that may be reviewed objectively by this Court, which I believe to be a violation of Furman and its progeny, as well as Thompson.
I recognize that the death penalty statute itself requires the trial court to consider a defendant's age as a mitigating factor. § 921.141(6)(g), Fla. Stat. (1987). Yet this fact alone does not address the concerns of Thompson. A mitigating factor is only one element to be weighed against aggravating factors in deciding whether to impose death. Under Thompson, death never can be appropriate for children below a certain age, no matter how many aggravating factors there are. See Thompson, 108 S.Ct. at 2695 (plurality opinion). This, I believe, is the concern that the legislature must address directly and explicitly before we may conclude that section 39.02(5)(c) passes muster under the narrowest ground upon which the Thompson court agreed.
I also am troubled by the majority's partial reliance on chapter 81-269, Laws of Florida, in reaching its conclusion that the legislature specifically has authorized the execution of children. Maj. op. at 757. This enactment took effect several months after the crime in this instance, and the majority's analysis thus tends to suggest an improper ex post facto application of a sentencing statute. See Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). I believe the post-1980 legislative history of section 39.02 should play no part in the decision reached today.
For the foregoing reasons, I dissent as to the sentence.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Jon was later found not guilty in a separate trial.
[3] As a family member, Jon could not be guilty as an accessory after the fact. § 777.03, Fla. Stat. (1979).
[4] § 921.141(5)(b), Fla. Stat. (1979).
[5] § 921.141(5)(d), Fla. Stat. (1979).
[6] § 921.141(5)(e), Fla. Stat. (1979).
[7] Fla. SJR 25 (1949) (adopted Nov. 7, 1950). For an examination of the rationale for this amendment, see Waybright, A Proposed Juvenile Court Act for Florida, 4 U.Fla.L.Rev. 16 (1951).
[8] Ch. 29900, § 2, Laws of Fla. (1955).
[1] The United States Supreme Court specifically has left this question open in Thompson v. Oklahoma, 108 S.Ct. 2687, 2700 (plurality opinion), at 2706-11 (O'Connor, J., concurring) (1988).
[2] This ground, noted by Justice O'Connor, was that there is some as-yet undetermined age below which a child constitutionally can never be punished, and that this age must be determined in light of evolving societal standards. Thompson, 108 S.Ct. at 2706 (O'Connor, J., concurring).