Clayton Joel Flowers, the appellant, was indicted for the capital murder of Karen Rolin. Specifically, the appellant was charged with intentional murder during the course of sodomy, in violation of § 13A-5-40(a)(3), Code of Alabama 1975. The jury found the appellant guilty as charged in the indictment. At the sentencing phase of the trial, the jury, by a vote of 11 to 1, recommended that the appellant be sentenced to life imprisonment without parole. The trial judge rejected that jury's recommendation and sentenced the appellant to death. The appellant was 15 years of age at the time this offense was committed.
At approximately 1:00 a.m. on the morning of June 5, 1990, Melissa Stone saw Karen Rolin at the Delchamps grocery store in Bay Minette with two young boys. Later that morning, the body of Karen Rolin was found floating under the Hollinger Creek Road bridge in Baldwin County, Alabama. A tire tool and a tire jack were found near the body. There was blood on *Page 980 
the bridge and on the guard rail of the bridge. That same morning, the victim's car was found some distance away in Forest Park Lake.
The appellant gave two statements regarding the victim's death, the first to the Bay Minette Police Department and the second to the Baldwin County Sheriff's Department. The following is a summary of those statements. In the early morning hours of June 5, 1990, the appellant and Bill Caraway were at Raymond White's house when the victim picked them up. The three went to Delchamps, where the victim attempted to cash her paycheck and then they got some gasoline. At this point, Caraway was driving, and he drove to Pine Grove Middle School. There, the victim said she wanted to have sex with the appellant, and they did. The appellant said that he used a condom. Afterwards, Caraway wanted to have sex with her. At this point, they all got out of the car and the appellant sat on the trunk of the car. The victim performed oral sex on the appellant while Caraway had anal intercourse with her. The appellant said that he had anal intercourse with the victim also. They then got back into the car and Caraway drove to Hollinger Creek Road bridge where Caraway got out of the car and told the appellant to get out. Caraway told the appellant that he wanted to "shut her mouth." Caraway then went and opened the trunk and told the victim to get out of the car. The appellant told Caraway that he did not want to be involved, and he got back in the car. Caraway began hitting the victim with his fists and a tire tool and then he told the appellant to get out of the car. When the appellant got out, Caraway handed him the tire tool and told him to hit the victim. The appellant threw down the tire tool. Then Caraway handed the appellant a tire jack, and the appellant hit the victim with it one time, but he thought that she was already dead. Caraway and the appellant then dragged the victim across the bridge and threw her body into the creek. Caraway and the appellant drove to Forest Park Lake. Caraway wedged a stick against the accelerator of the victim's car, and the car went into the lake. Caraway and the appellant then went to White's house and White took him home.
Dr. Leroy Riddick performed the autopsy on the victim's body. The autopsy revealed numerous lacerations to the head and face, multiple fractures to the skull, and defensive wounds to the arms. Dr. Riddick testified that the victim died of multiple blunt force injuries to the head and that those injuries could have been caused by a tire jack. The autopsy also revealed the presence of six tears around the anus and that semen was present in the anus. Riddick stated that the tears to the anus would have been painful.
Forensic tests showed that blood found on the victim's car was the same type as the victim's blood. A footprint impression taken near a pool of blood on the bridge matched the shoeprint of one of the appellant's shoes. Vaginal swabs taken from the victim were negative for the presence of seminal fluid but anal swabs taken from the victim were positive for the presence of seminal fluid. No semen was found in a condom which was found in the victim's car. Twelve of the victim's finger prints or palm prints were found on the top of the trunk of her car. Thirteen of the appellant's finger prints and palm prints were found on various places inside and outside of the victim's car. Two of the appellant's palm prints were found overlapping two of the victim's palm prints on the trunk. The palm prints of the appellant and the victim were facing different directions. The appellant's and the victim's palm prints were also found on the driver's window.
The appellant's testimony at trial differed somewhat from his statements which were given to the police. The appellant testified that after he and the victim had had consensual sex at the Pine Grove Middle School, Caraway got in the backseat with the victim and the appellant took a walk. A while later, Caraway called him back to the car. The victim seemed upset and Caraway was mad. Caraway then drove to Hollinger Creek Road bridge where he stopped and told the appellant that he needed to talk to him outside of the car. The appellant got out of the car and *Page 981 
Caraway opened the trunk and said "We need to make sure she don't say anything" because "she wouldn't give it to me, so I took it." The appellant replied that he "wasn't going to have no part of this." Caraway told the victim to get out of the car, and the appellant got back into the car and listened to the radio. A few minutes later, Caraway told the appellant to get out of the car. When he did, the appellant saw the victim lying on the ground and saw Caraway with a tire tool in his hand. Caraway handed him the tire tool and told the appellant to hit the victim. The appellant threw it down. Caraway then handed the appellant the tire jack and said, "Hit her with this or I will hit you with it." The appellant then threw the jack down and he vomited. He doesn't remember whether he hit the victim with the jack. The appellant heard a splash and then heard the trunk close. He and Caraway got back in the car and drove to Forest Park Lake. The appellant got out of the car and started walking. He heard the sound of a motor and a splash. The appellant and Caraway then returned to White's house.
 I
The appellant contends that his statements to the police should have been suppressed for several reasons. The following testimony was taken at the suppression hearing.
Larry Durant and Alec McDowell, the assistant police chief and the police chief of the Bay Minette Police Department, took the first statement from the appellant. They testified that the appellant voluntarily came to the police station with his stepfather, Harold Eliott, after McDowell had contacted the appellant's family and told them that he needed to talk to the appellant about the murder of Karen Rolin. When the appellant arrived at the station, Durant advised the appellant of hisMiranda rights and his right to have a parent present while he was questioned. At this point, the appellant stated that he wanted his stepfather there with him. Eliott said that his wife, the appellant's mother, was too upset to be there and that she wanted him there. Eliott was with the appellant during the interrogation. At some point during the interrogation, the appellant's father, Ronald Flowers, came to the police station. Durant asked the appellant if he wanted his father present and the appellant said that he did not. Durant and McDowell stated that the appellant voluntarily made the statement and that no threats, no inducements, or no promises were made to the appellant and no hopes of reward offered in order to obtain his statement. The appellant did not appear to be under the influence of drugs or alcohol at the time he made his statement. Although the appellant was upset and crying, he appeared to understand what was happening and he could communicate with the officers.
Investigators Ronald Everts and Richard Bryars of the Baldwin County Sheriff's Department took the second statement from the appellant. Everts advised the appellants of his rights by reading from a juvenile waiver form. They testified that no threats, no inducements, or no promises were made to the appellant and no hopes of reward were offered and that he voluntarily gave them a statement. The appellant was told he could have either one or both of his parents present. The appellant said he didn't want to see his natural father. The appellant never asked to see his natural parents or a lawyer. Bryars stated that no one prevented the natural parents from seeing the appellant.
Ronald Flowers, the appellant's natural father, testified that the appellant's brother informed him that the police were interrogating the appellant, although he knew the day before that the appellant was going to talk to the police. He went to the police station and asked to see the appellant. Durant told him "It's no use you going in there and seeing him because he is still in there being interrogated." Flowers did not see the appellant until after the interrogation. Flowers stated that his wife had custody of the appellant and that he knew that the appellant's stepfather, Eliott, went with the appellant to the police station. Flowers testified that he would have hired an attorney if he had been with the appellant during questioning. *Page 982 
Marilyn Flowers, the appellant's natural mother, testified that her husband, Harold Eliott, went with the appellant to the police station and that she thought that Eliott was going to call Ronald Flowers to come to the station also. She stated that Eliott had had some beers prior to going to the station. She and Eliott have divorced since that time. She stated that all decisions pertaining to the appellant were made solely by her and Ronald Flowers and that Eliott was not responsible enough to make any decisions concerning the appellant. She stated that she knew the appellant was being questioned concerning the night Rolin was killed but that she didn't know how serious the situation was and, if she had, she would have been there with the appellant during questioning.
 A
The appellant asserts that he was not properly advised of his rights and, therefore, he could not appreciate the consequences of waiving those rights. Rule 11(A), A.R.Juv.P., provides:
 "(A) When the child is taken into custody, he must be informed of the following rights by the person taking him into custody:
"(1) That he has the right to counsel;
 "(2) That if he is unable to pay a lawyer and if his parents or guardian have not provided a lawyer, one can be provided at no charge;
 "(3) That he is not required to say anything and that anything he says may be used against him; and
 "(4) If his counsel, parent, or guardian is not present, that he has a right to communicate with them, and that, if necessary, reasonable means will be provided for him to do so."
Officer Durant testified that before he took the first statement from the appellant, he informed the appellant of hisMiranda rights[1] and his right to have a parent present during questioning.[2] Durant said that he read the Miranda warnings from a standard Miranda form. Kinder v. State, 515 So.2d 55, 68
(Ala.Crim.App. 1986), cert. denied (Ala. 1987) (quoting Exparte Whisenant, 466 So.2d 1006, 1007 (Ala. 1985)). The tape-recorded statement which was made to Durant and McDowell also indicates that the appellant was informed of his rights. Officer Everts testified that he informed the appellant of his rights by reading from a juvenile waiver form. The tape recording of the appellant's second statement clearly shows that the appellant was informed of his rights. The appellant seems to argue that the fact that the police could not find either one of the waiver forms that the appellant signed indicates either that the waivers were never executed or that the appellant did not knowingly waive his rights. This contention is meritless. The tape recordings reveal that the appellant clearly knew that he was waiving his rights and show that he had signed a waiver which was witnessed by the officers and by Eliott. Furthermore, the appellant stated on the tape that he made the statements "of his own free will" and that he had returned to Alabama from Georgia (where he was living with his mother and Eliott) to "turn himself in." The fact that the waiver forms were lost between the time they were executed and the trial date is not determinative of whether the appellant knowingly waived his rights, because in many instances the waiver forms are not introduced into evidence or the accused refuses to sign a waiver form. See Chambers v. State,497 So.2d 607 (Ala.Crim.App. 1986); Player v. State, 421 So.2d 1338
(Ala.Crim.App.), cert. denied (Ala. 1982); Proctor v. State,391 So.2d 1092 (Ala.Crim.App. 1980).
 B
The appellant also contends that his waiver was not made knowingly and intelligently *Page 983 
because he was not informed that he was going to be charged with an offense in this case or that if he was going to be charged, that he would be charged with a capital offense and that he could face the death penalty. This argument is without merit. There was testimony taken at the suppression hearing that the officers informed the appellant that he was being questioned about the murder of Karen Rolin before the appellant made each statement. The tape-recorded statements support this testimony. Furthermore, the appellant stated that he came to the police station to "turn himself in." Clearly, this statement indicates that the appellant knew that he was going to be charged in connection with this offense when he came to the police station.
We know of no requirement that a suspect must be informed of all the offenses with which he could be charged and the particular punishments he could receive before he makes a statement. This is particularly true because in most instances the officers may not know what the offender will be charged with until after the suspect has made his statement. In this case, Chief McDowell specifically testified that he did not know that he was going to charge the appellant with capital murder until after the appellant had made his statement. Furthermore, telling a suspect that he is going to be charged with a capital offense and that he could receive the death penalty could be perceived as coercive in a particular situation. See Stewart v. State, 562 So.2d 1365
(Ala.Crim.App. 1989).
 C
The appellant contends that his waiver of his rights was not voluntarily made because neither of his parents were present during questioning and because his stepfather, who was present, does not qualify as a parent or guardian under Rule 11(A)(4). First of all, as we have stated, Rule 11(A)(4) does not require that a parent be present during the questioning of a juvenile. All that is required is that the juvenile be informed that he has the right to communicate with a parent and that he be allowed to communicate with that parent if he so chooses.Payne v. State, 487 So.2d 256 (Ala.Crim.App. 1986); Baker v.State, 487 So.2d 264 (Ala.Crim.App. 1986). "We know of no absolute requirement which necessitates the presence of a parent or other interested adult in order for a juvenile to make an effective waiver." Baker v. State, 450 So.2d 470, 471
(Ala.Crim.App. 1984). Thus, we need not address whether Eliott qualified as a parent or guardian in this particular situation because the appellant had no right to have a parent present and because he never asked to communicate with his parents.
Second, even if there was a right to have a parent present during the questioning of a juvenile, the right would belong to the juvenile, not the parent. See Bombailey v. State,580 So.2d 41 (Ala.Crim.App. 1990). Here, the appellant was told that he could have either or both of his parents present with him. The appellant told the officers that his mother was too upset to be present and that he did not want his father to be present but he said that he wanted his stepfather to be present, which the officers allowed. The officers testified that they never prohibited the appellant from seeing his parents and that the appellant never asked to see either of his natural parents or a lawyer. See M.B.M. v. State, 563 So.2d 5 (Ala.Crim.App. 1989). The fact that the appellant's parents, in hindsight, wished that they had been present during the questioning of the appellant does not confer upon them a right that does not exist.
 D
The appellant contends that it was error to allow officers Durant and Everts to read the appellant's rights from a standard form at trial because the form from which they read was not the same form that the officers used when they read the appellant his rights before he gave his statements. Officer Durant testified that the form from which he read theMiranda rights at trial was a copy of the same form containing the Miranda rights which the *Page 984 
Bay Minette Police Department uses everyday and that this form contained the exact same rights as those he read to the appellant. He stated that he never recites the Miranda rights "off the top of his head" and that he always reads from this form or a copy thereof because to do so is standard police procedure. Officer Everts testified that he read the appellant his rights from a form, which is the standard state form, that was provided to him by the juvenile officers in Baldwin County and which is the form that is utilized in Baldwin County. He testified that although it was not the form from which he read the appellant his rights, it was an exact copy. The forms from which the officers read the rights they gave to the appellant were not introduced into evidence. We find no error in allowing these officers to read the rights they gave the appellant from a standard form when they both testified that the forms from which they read at trial and the forms from which they read the appellant his rights were the same. " 'Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by Miranda." ' " M.B.M, 563 So.2d at 8 (quoting Duckworth v. Eagan, 492 U.S. 195, 109 S.Ct. 2875,106 L.Ed.2d 166 (1989)). The warnings that these officers testified that they gave to the appellant reasonably conveyed to the appellant his rights as required by Miranda and Rule 11(A), A.R.Juv.P.
 "It is well settled in this state that an extrajudicial statement is presumed to be involuntary and is inadmissible at trial unless the State presents sufficient evidence to show that the statement was in fact voluntary and that the proper Miranda warnings were given. Ex parte Johnson, 522 So.2d 234 (Ala. 1988); Crowe v. State, 485 So.2d 351 (Ala.Cr.App. 1984), reversed on other grounds, 485 So.2d 373 (Ala. 1985). When the State seeks the admission of the statement of a juvenile, the State must show that the juvenile was advised of his rights under Rule 11(A), A.R.Juv.P., rather than the standard Miranda rights of which adults are advised. See Ex parte Whisenant, 466 So.2d 1006
(Ala. 1985); Scott v. State, 501 So.2d 1273
(Ala.Cr.App. 1986). Rule 11(A) contains the basic Miranda warnings, plus the additional information that the juvenile has the 'right to communicate with [his counsel, parent, or guardian if they are not present], and that if necessary, reasonable means will be provided for him to do so.' " Rule 11(A)(4), A.R.Juv.P. See Ex parte Whisenant, supra.
 "Due process requires the trial court to hear evidence outside the presence of the jury in order to determine whether the statement or confession was, in fact, voluntarily made. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Miller v. Dugger, 838 F.2d 1530 (11th Cir.), cert. denied [486] U.S. [1061], 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). This determination is to be made based upon a consideration of the 'totality of the circumstances.' Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 248 (1960); Myers v. State, 431 So.2d 1342, 1345
(Ala.Cr.App. 1982), writ quashed, 431 So.2d 1346
(Ala. 1983).
 "The United States Supreme Court has specifically held that the 'totality of the circumstances' test is applicable when determining the admissibility of a juvenile's confession:
 " 'This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits — indeed it mandates — inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature *Page 985 
of his Fifth Amendment rights, and the consequences of waiving those rights.'
 "Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (quoted in Chambers v. State, 497 So.2d 607, 609-10
(Ala.Cr.App. 1986)); Jackson v. State, 516 So.2d 726, 745 (Ala.Cr.App. 1985)). See also Scott v. State, 501 So.2d at 1274; Whisenant v. State, 466 So.2d 995, 1000 (Ala.Cr.App. 1984), reversed on other grounds, 466 So.2d 1006 (Ala. 1985)."
Carr v. State, 545 So.2d 820, 822 (Ala.Crim.App. 1989). The state showed that the appellant was advised of his Miranda
rights and of those guaranteed by Rule 11(A), A.R.Juv.P., and it presented evidence that the appellant's statements were made voluntarily, after a knowing waiver of his rights. Thus, it is clear from our consideration of the "totality of the circumstances," including the appellant's age (15 years old) and educational level (completed ninth grade), that the trial court's finding that the appellant's statements were voluntarily made is fully supported by the evidence.
 II
During his oral charge to the jury, the judge instructed the jury on the capital offense of intentional murder during the course of sodomy and on the lesser included offenses of intentional murder and sodomy. The appellant seems to argue that the trial judge should have instructed the jury that they could find the appellant guilty of murder and sodomy without necessarily finding him guilty of a capital offense. This argument is without merit. Under the facts of this case, if the jury found that the appellant committed the murder and the sodomy, the appellant is guilty of the capital offense of intentional murder during the course of sodomy and not of two separate offenses. The events which constituted this offense were part of one continuous transaction. Although there is some doubt as to whether the sodomy occurred at the Pine Grove School or at the Hollinger Creek Road bridge, there is no doubt that the victim was killed because she had been sodomized and because the appellant and Caraway wanted to make sure that she did not go to the police. The capital offense of murder during the course of sodomy occurs when it is shown that the murder was committed "in the course of or in connection with the commission of, or in immediate flight from the commission of" a sodomy (§ 13A-5-39(2), Code of Alabama). See Bradley v.State, 494 So.2d 750 (Ala.Crim.App. 1985), aff'd,494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385,94 L.Ed.2d 699 (1987). Certainly, the facts of this case indicate that the murder occurred in connection with the commission of the sodomy. The crime began with the sodomy, and it was consummated when the victim was killed. See generally Connollyv. State, 500 So.2d 57 (Ala.Crim.App. 1985), aff'd,500 So.2d 68 (Ala. 1986); Hallford v. State, 548 So.2d 526
(Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala. 1989), cert. denied,493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Thus, there was no proof that two separate offenses, unrelated to each other, occurred here. The trial judge properly instructed the jury on the offenses in question and did not err by failing to give the additional instruction requested by defense counsel.
 III
During the presentation of the appellant's defense, defense counsel sought to admit the testimony of Rayford Mitchell, an inmate in the Baldwin County jail. Mitchell would have testified that Bill Caraway told him that the appellant had sex with the victim. Caraway then said that he wanted to have sex with the victim and that she refused. Caraway stated that he tried to force the victim to have sex with him and that when she refused and started screaming, he hit her with a jack and had sex with her after she was dead. Caraway also told Mitchell that he had run over the victim with the car. The trial judge refused to allow Mitchell's testimony because it constituted inadmissible hearsay. The appellant contends this refusal was error.
 "As a general rule, an accused may introduce any legal evidence that tends *Page 986 
to show that someone else committed the crime for which he is charged. Green v. State, 258 Ala. 471, 64 So.2d 84 (1953). See generally C. Gamble, McElroy's Alabama Evidence, 48.01(1) (3rd ed. 1977); Schroeder, Hoffman and Thigpen, Alabama Evidence, § 4-4(a)(c) (1987).
 "However, hearsay evidence is not legal evidence and is not admissible to show that someone other than the accused committed the offense at issue. Houston v. State, 208 Ala. 660, 95 So. 145 (1923). See also McDonald v. State, 241 Ala. 172, 1 So.2d 658 (1941); Morris v. State, 25 Ala. App. 175, 142 So. 685 (1932)."
Thomas v. State, 539 So.2d 375, 395 (Ala.Crim.App.), aff'd,539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910,109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
The appellant concedes that Mitchell's testimony was hearsay evidence, but he argues that this evidence should have been admitted under the declaration against interest exception to the hearsay rule. The traditional rule in Alabama has been that
 "In a criminal action, the declaration of a person, since deceased that he committed the crime for which the accused is being tried, is not admissible under the hearsay exception for declarations against pecuniary or proprietary interest and this is true regardless of the fact that the declaration also tended to subject the declarant to civil liability in tort."
C. Gamble, McElroy's Alabama Evidence, § 249.02(1) (4th ed. 1991) (citing Wesson v. State, 238 Ala. 399, 191 So. 249
(1939)); Wells v. State, 21 Ala. App. 217, 107 So. 31 (1926);Spicer v. State, 198 Ala. 13, 73 So. 396 (1916); West v. State,76 Ala. 98 (1884). This court's holding in Lundy v. State,539 So.2d 324 (Ala.Crim.App. 1988), cert. denied (Ala. 1989), appears to have modified the rule as set out above. In Lundy, this court implicitly held that the person did not have to be deceased but merely unavailable and explicitly held that the hearsay declarant in that case was unavailable because he would have refused to testify by asserting his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. The appellant alleges that the hearsay declarant in this case, Caraway, would have invoked his Fifth Amendment privilege and, thus, would have been unavailable. We agree that under the reasoning of Lundy, Caraway was an unavailable witness.[3]
However, we do not believe that Lundy modified the basic rule that the declaration of a person, who is now unavailable, that he committed the offense for which the defendant is being tried, is not admissible under the hearsay exception in question. In Lundy, the defendant was charged with the capital murder of his wife. The state's evidence tended to show that he hired Rex Goodson to run over his wife with his truck and kill her and that Goodson did so. During the state's case in chief, Rex Goodson's uncle was allowed to testify that Rex came to his house shortly after the collision that killed the defendant's wife and said, "I have run over somebody. I don't know how badly they are hurt and I want to call the police." Lundy, 539 So.2d at 329. Defense counsel objected to the admission of this evidence as hearsay. On appeal, this court stated that although the statement was hearsay, the statement was an admission against interest and was properly admitted as an exception to the hearsay rule. The reason this court found that the statement was properly admitted as a declaration against interest is because the statement was "an admission to being involved in an accident" not "an admission to a crime." Lundy, 539 So.2d at 330. Here, Caraway's statement to Mitchell was an admission to a crime, i.e., the crime for which the appellant was being tried and, thus, it is not admissible under the hearsay exception for declarations against pecuniary or proprietary interest.
In Lundy, 539 So.2d at 330, we stated: *Page 987 
 "Rule 804(b)(3) of the Federal Rules of Evidence provides that a statement against interest is admissible when the declarant is unavailable. This includes statements that would subject the declarant to either criminal or civil liability, if a reasonable person in that position would not have made that statement, had they not believed it to be true."
Although we made reference to this federal rule inLundy, we did not overrule the existing law and adopt the federal rule as law. While an increasing number of jurisdictions, like the federal courts, are allowing extrajudicial declarations of a criminal act to be admitted into evidence in a criminal trial, Annot., 92 A.L.R.3d 1164 (1979), we do not find this to be the rule of law in this state at this time.
The appellant also argues that Chambers v. Mississippi,410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), is controlling in this case. In Thomas, this court addressed this very issue in a similar fact situation to the one at bar and distinguishedChambers. We find that the rationale expressed in Thomas also applies to distinguish the present case from Chambers.
Furthermore, we believe that the reasoning from the following Mississippi case addressing this issue is relevant:
 "In Chambers, one McDonald had confessed to several persons that he and not Chambers killed the deceased. McDonald thereafter repudiated his confessions but was present when Chambers was tried. Chambers held that proof of McDonald's confession was admissible and the case was reversed because this testimony had been excluded.
 "The Mississippi rule regarding the inadmissibility of declarations against penal interest where the declarant is not available as a witness was announced in Brown v. State, 99 Miss. 719, 55 So. 961 (1911). Brown was not overruled in Chambers, for in the latter opinion the Court noted that '. . . we need not decide in this case, whether, under other circumstances, it might serve some valid state purpose by excluding untrustworthy testimony.' 410 U.S. at 300, 93 S.Ct. at 1048. And in Chambers, the Court said that 'the availability of McDonald [the declarant] significantly distinguishes this case from prior Mississippi precedent, Brown v. State, supra. . . .' 410 U.S. at 301, 93 S.Ct. at 1049.
 "We hold, therefore, that the validity of the rule announced in Brown was not undermined by the Chambers opinion, and where the declarant is not available, his out-of-court declarations against penal interest are not sufficiently trustworthy to justify the Court in making an exception to the hearsay rule."
Thompson v. State, 309 So.2d 533 (Miss. 1975), cert. denied,423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 250 (1975).
Likewise, we find that our present rule, which forbids the admission into evidence at a criminal trial of a declaration by an unavailable declarant that he committed the crime for which the defendant is being tried, was not overruled byChambers, and the out-of-court statement made by Caraway to Mitchell was illegal hearsay evidence.
Furthermore, even had this evidence been legal, we would still conclude that it was properly excluded. While it is proper to present legal evidence to show that someone else committed the offense for which the accused is charged, that evidence, to be admissible, must be inconsistent with the guilt of the accused. Thomas. Here, the evidence sought to be introduced by the appellant was not inconsistent with the appellant's guilt of the charged offense. This evidence only showed that someone else, Caraway, may also have been guilty of the charged offense. There is no error here.
 IV
The appellant contends that the trial court erred by refusing defense counsel's "request that special interrogatories be sent to the jury for the purpose of aiding the jury in its deliberations." (Appellant's brief (Pennington), p. 24.) Section 12-16-14, Code of Alabama 1975, provides: "All instruments of evidence and depositions read to the jury may be taken out by *Page 988 
them on their retirement." See also Rule 22.1, A.R.Crim.P; C. Gamble, McElroy's Alabama Evidence, § 10.04 (4th ed. 1991). Rule 14, A.R.Crim.P.Temp., allows the court, in its discretion, to submit the charge against the defendant and the "given" written instructions to the jury in a complex case. See also
Rule 21.1, A.R.Crim.P. We can find no authority in Alabama nor has the appellant cited us to any authority which requires or allows the submission of special interrogatories to the jury during its deliberations. Thus, this argument is without merit.
 V
The appellant argues, and the attorney general concedes, that the appellant's sentence of death must be vacated. InThompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687,101 L.Ed.2d 702 (1988), a plurality of the United States Supreme Court held that it would violate the Eighth Amendment to execute a defendant who was under the age of 16 at the time the offense was committed.[4] The plurality opinion was authored by Justice Stevens and concurred in by Justices Brennan, Blackmun, and Marshall. Justice O'Connor concurred in the judgment and wrote a concurring opinion. Justice Scalia wrote a dissenting opinion, which was joined by Chief Justice Rehnquist and Justice White. Justice Kennedy did not participate in the opinion. With regard to the interpretation of a plurality opinion, the Supreme Court has stated that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Gregg v.Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15,49 L.Ed.2d 859, 872 n. 15 (1976). Thus, we need to look to Justice O'Connor's opinion to determine the exact holding of the Supreme Court. In her opinion, Justice O'Connor stated that the plurality and dissent agree on two things: "that there is some age below which a juvenile's crimes can never be constitutionally punished by death, and that our precedents require us to locate this age in light of the ' " 'evolving standards of decency that mark the progress of a maturing society.' " ' " Thompson, 487 U.S. at 848, 108 S.Ct. at 2706. Justice O'Connor went on to say that although she believed "that a national consensus forbidding the execution of any person for a crime committed before the age of 16 very likely does exist," she was "reluctant to adopt this conclusion as a matter of constitutional law" at that time. Because of this, Justice O'Connor was unwilling to decide whether the execution of those under age 16 violates the Eighth Amendment. However, Justice O'Connor concurred in the plurality's decision that Thompson's death sentence should be vacated because Oklahoma's capital offense statute did not set a minimum age below which the death penalty could not be imposed upon a person convicted of a capital offense.
 "The case before us today raises some of the same concerns that have led us to erect barriers to the imposition of capital punishment in other contexts. Oklahoma has enacted a statute that authorizes capital punishment for murder, without setting any minimum age at which the commission of murder may lead to the imposition of that penalty. The State [Oklahoma] has also, but quite separately, provided that 15-year-old murder defendants may be treated as adults in some circumstances. Because it proceeded in this manner, there is a considerable risk that the Oklahoma legislature either did not realize that its actions would have the effect of rendering 15-year-old defendants death-eligible or did not give the question the serious consideration that would have been reflected in the explicit choice of some minimum age for death-eligibility. Were it clear that no national consensus forbids the imposition of capital punishment for crimes committed before the age of 16, the implicit nature of the Oklahoma legislature's decision would not be constitutionally problematic. In the peculiar circumstances we face today, however, the Oklahoma *Page 989 
statutes have presented this Court with a result that is of very dubious constitutionality, and they have done so without the earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty. In this unique situation, I am prepared to conclude that petitioner and others who were below the age of 16 at the time of their offense may not be executed under the authority of a capital punishment statute that specifies no minimum age at which the commission of a capital crime can lead to the offender's execution."
Thompson, 487 U.S. at 857, 108 S.Ct. at 2711. The facts ofThompson are indistinguishable from those before us. The appellant, like Thompson, was 15 at the time he committed the capital offense. Alabama's death statute provides no minimum age below which the death penalty cannot be imposed upon a person. Further, Alabama's statutory scheme, which allows a child over the age of 14 to be tried as an adult, is similar to the one that was in effect in Oklahoma at the time Thompson was decided. Thus, we must vacate the appellant's sentence of death.
An amicus brief was filed in this case by the district attorney of Baldwin County. In his brief, the district attorney asserts that the Supreme Court's decision in Thompson was reversed by that Court's ruling in Stanford v. Kentucky,492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). We disagree and find that the facts presented in and the holding ofStanford are distinguishable from the case at bar. In Stanford, a plurality opinion, authored by Justice Scalia and joined by Chief Justice Rehnquist and Justices White and Kennedy, stated that the execution of a defendant who was 16 or 17 years of age at the time of the commission of a capital offense does not violate "the Eighth Amendment's prohibition against cruel and unusual punishment." Stanford, 492 U.S. at 380,109 S.Ct. at 2980. Justice Brennan wrote a dissenting opinion, which was joined in by Justices Stevens, Marshall, and Blackmun. Just as in Thompson, Justice O'Connor wrote a concurring opinion, which represents the holding of the court. In her opinion, Justice O'Connor explicitly distinguished her holding in Thompson from her holding in Stanford and stated:
 "Last Term, in Thompson v. Oklahoma, 487 U.S. [815] [857-858], 108 S.Ct. 2687, [2710-2711] 101 L.Ed.2d 702 (1988) (concurring in judgment), I expressed the view that a criminal defendant who would have been tried as a juvenile under state law, but for the granting of a petition waiving juvenile court jurisdiction, may only be executed for a capital offense if the State's capital punishment statute specifies a minimum age at which the commission of a capital crime can lead to an offender's execution and the defendant had reached that minimum age at the time the crime was committed. As a threshold matter, I indicated that such specificity is not necessary to avoid constitutional problems if it is clear that no national consensus forbids the imposition of capital punishment for crimes committed at such an age. Id. at [857] 108 S.Ct., at [2710]. Applying this two-part standard in Thompson, I concluded that Oklahoma's imposition of a death sentence on an individual who was 15 years old at the time he committed a capital offense should be set aside. Applying the same standard today, I conclude that the death sentences for capital murder imposed by Missouri and Kentucky on petitioners Wilkins and Stanford, respectively, should not be set aside because it is sufficiently clear that no national consensus forbids the imposition of capital punishment on 16- or 17-year-old capital murderers."
Stanford, 492 U.S. at 380, 109 S.Ct. at 2981. We conclude that neither the plurality's nor Justice O'Connor's reasoning inStanford affects this court's decision in the case at bar, because the appellant was 15 years of age at the time he committed the capital offense and the petitioners in Stanford
were 16 and 17 years old at the time of their offenses. The district attorney of Baldwin County seems to argue that the court's holding in Thompson somehow has been explicitly overruled because since the time the case was decided, Justice Brennan *Page 990 
has retired and has been replaced by Justice Souter. We disagree. The Supreme Court's opinion in Stanford did not overrule its previous holding in Thompson and, thus, Thompson
remains the law of this land and is controlling upon this court. Further, the district attorney argues that Thompson
should be distinguished from this case because he alleges that the Legislature intended that 15-year-olds should be subject to the death penalty because the Legislature provided that the appellant's age should be a mitigating factor in determining whether the death penalty should be imposed upon a particular defendant, and he cites us to a Florida case, LeCroy v. State,533 So.2d 750 (Fla. 1988), cert. denied, 492 U.S. 925,109 S.Ct. 3262, 106 L.Ed.2d 607 (1989). In LeCroy, a pre-Stanford case, the Florida Supreme Court distinguished Thompson on four different grounds: 1) the defendant in LeCroy was 17 years old at the time he committed the capital offense; 2) a Florida statute provides that a child of any age indicted for a crime punishable by death or life imprisonment "shall be tried and handled in every respect as if he were an adult," LeCroy, 533 So.2d at 758 (quoting Fla.Stat.Ann. § 39.02(5)(c)); 3) "point two is reinforced by the Florida Legislature's decision that age should be a statutory mitigating factor"; and 4) the trial judge in sentencing the defendant considered his age but found him to be mentally and emotionally mature and this was consistent with the jury's recommendation of death. We are unconvinced by the district attorney's argument based onLeCroy. First of all, the court in LeCroy specifically stated that it was limiting its holding to the particular facts before it and it did not consider this case "to be a definitive resolution of whether there is some irreducible minimum age below which the death penalty may never be imposed." LeCroy, 533 So.2d at 758. Second, while the court did say that the fact that the legislature included age as a statutory mitigating factor indicated that the legislature had considered that a "child" may be death-eligible, it specifically stated that this fact should be considered with the statute, which provides that a child of any age who is indicted for an offense punishable by death or life imprisonment shall be treated as an adult in every respect. Third, the main distinction between these two cases is the age of the two defendants. The appellant here was 15 years old and the defendant in LeCroy was 17 years old. The facts of LeCroy are more similar to Stanford thanThompson. While it is true that there was no provision under Oklahoma law that designated the defendant's age as a mitigating factor at the time Thompson was decided, we are not convinced that the inclusion of such a provision in our death statute indicates that the Legislature specifically considered and intended that the death penalty should be imposed on 14- or 15-year-old capital defendants. Furthermore, courts of two other states, which also have provisions in their death statutes which provide that the defendant's age shall be a mitigating factor, have vacated the death sentences of 15-year-old capital defendants under Thompson.[5] See State v.Stone, 535 So.2d 362 (La. 1988); Cooper v. State,540 N.E.2d 1216 (Ind. 1989). Therefore, based on the reasons set out above, the appellant's sentence of death is vacated, because it violates the Eighth Amendment's prohibition against cruel and unusual punishment.
The appellant's other issue concerning the heinous, atrocious, and cruel aggravating circumstance is moot since the death penalty cannot be imposed in this case. Furthermore, during oral argument, the appellant asserted that the court's instructions to the jury on reasonable doubt during the guilt and sentencing phases of the trial were improper. No objection was made to these instructions during the trial, and the appellant did not assert this issue in his briefs to this court. During oral argument, this court granted the state's request to brief this issue. Although the state has filed a supplemental brief concerning *Page 991 
this issue, the appellant has not filed a supplemental brief with this court with regard to this issue. An objection to the court's oral charge to the jury cannot be raised for the first time on appeal. Kyser v. State, 513 So.2d 68
(Ala.Crim.App. 1987), Rule 14, A.R.Crim.P.Temp. Thus, we find that this issue has not been preserved for review. We must also note that because the appellant cannot receive a death sentence in this case, we are not required to notice plain error in the record. Rule 45A, A.R.App.P.; Cook v. State, 384 So.2d 1158
(Ala.Crim.App.), cert. denied, 384 So.2d 1161 (Ala. 1980); Eady v. State,424 So.2d 694 (Ala.Crim.App. 1982).
The appellant's conviction of the capital offense is affirmed. The appellant's sentence of death is vacated and this cause is remanded to the trial court with instructions that the appellant be sentenced to life imprisonment without the possibility of parole.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.
All the Judges concur.
[1] "Rule 11 (A)(1), (2), and (3) taken together, are substantially the same as the warnings required in Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."Kinder v. State, 515 So.2d 55, 68 (Ala.Crim.App. 1986), cert.denied (Ala. 1987) (quoting Ex parte Whisenant, 466 So.2d 1006,1007 (Ala. 1985).
[2] "Rule 11(A) does not require that a juvenile be informed that has the right to have a parent or guardian present, but only that he has the right to communicate with them" Baker v. State,450 So.2d 470, 471 (Ala.Crim.App. 1984).
[3] However, there would have had to have been evidence that Caraway would have invoked the Fifth Amendment to show his actual unavailability. In Lundy, the court contacted the hearsay declarant's attorney. The attorney told the court that, if his client was called to testify, the client would assert his Fifth Amendment privilege against self-incrimination.
[4] The Eighth Amendment to the United States Constitution provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment."
[5] We must note, however, that neither of these courts addressed the specific point raised by the district attorney of Baldwin County.
 ON APPLICATION FOR REHEARING