647 So.2d 57 (1994)
D.M.M.
v.
STATE.
CR 93-486.
Court of Criminal Appeals of Alabama.
June 17, 1994.
Rehearing Denied August 19, 1994.
Certiorari Denied October 7, 1994.
Joe W. Morgan, Jr., Birmingham, for appellant.
*58 James H. Evans, Atty. Gen., and Gregory O. Griffin, Sr., Asst. Atty. Gen., for appellee.
Alabama Supreme Court 1931724.
BOWEN, Presiding Judge.
This is the appeal from the order of the Juvenile Court of Jefferson County transferring D.M.M.,[1] a juvenile, to circuit court for criminal prosecution as an adult on a charge of capital murder in the death of Corey Denson in violation of Ala.Code 1975, § 13A-5-40(a)(17). The appellant raises three issues on this appeal.

I.
The appellant contends that the juvenile court erred in admitting his statement into evidence at the transfer hearing because "he asked to communicate with his mother, as was his right under law, and he was denied that right."
The homicide occurred on September 22, 1993. The appellant gave two statements to the police regarding the homicide. On September 27, 1993, he signed printed waiver of rights forms at 12:45 p.m. and at 2:10 p.m. (C.R. 33, 34) and gave a statement denying any involvement in the homicide. The appellant's mother was present when this statement was made. He was released after making that statement.
The next day, the police arrested the appellant at Phillips High School and brought him to the Police Administration Building. The appellant gave a second statement on September 28, 1993, after signing a printed waiver of rights form at 2:25 p.m. C.R. 35. There was testimony that the police contacted the appellant's mother before they questioned the appellant and that the mother refused to come or to allow the police to bring her to the Police Administration Building. The evidence was conflicting about whether the appellant requested his mother's presence before making this statement.
A large portion of the conflict and the controversy centers around the following statements, which appear at the end of the appellant's second statement to the police:
"Q. ([Birmingham Police Detective] Pressley) Okay, you know we read you your rights earlier, is that correct?
"A. [Appellant] Yes sir.
"Q. Ah, earlier on, we tried to contact your mother, Sergeant Moorer called your mother, right?
"A. Yes sir.
"Q. Cause you're a juvenile, you wanted your mother here?
"A. Yes sir.
"Q. And ah, your mother said she wasn't coming, is that correct, Sergeant Moorer?
"A. (Moorer) Yes.
"Q. (Pressley) Even though your mother didn't come up here, you still wish to talk to us, is that correct?
"Q. (Moorer) You don't want to talk to your momma?
"A. Oh, Yeah, I want to talk to her, yes sir.
"Q. Okay, she said she would be over to juvenile to talk to you.
"Q. (Pressley) And you still made a statement to us, is that correct, you still made a statement to us, is that correct?
"A. About what?
"Q. About what happened?
"A. Yes sir.
"Q. This been a true statement to the best of your knowledge, has this been a true statement to the best of knowledge?
"A. True.
"Q. Yeah, has this been true what you told us?
"A. Yes sir.
"Q. Ah, did anybody promise you anything to make this statement, like offer you any money or lesser sentence or anything like that to make this statement?
"A. No sir.
"Q. (Moorer) this concludes the statement, time now is 2:43." C.R. 40-41.
*59 At the transfer hearing, Birmingham Police Detective Andre Pressley testified that the appellant did not request that his mother be present until the end of the second statement as reflected above. Pressley testified that his reason for the above colloquy was:
"That we [were] trying to contact his mother. And prior to the other day, during the first day, we had his mother present. And I was just asking him that question just to see if he still wanted his mother here even though the fact that we had told him before that his mother wasn't coming." R. 232.
The juvenile court judge initially denied the appellant's motion to suppress, finding that the "statement ... was not illegally obtained" and that "the police did more than they had to do to try to get [D.M.M.'s] parents there." R. 163-64. Subsequently, the judge withdrew that ruling in order to "get some more testimony on" when the appellant requested his mother's presence. R. 179. After further testimony, the judge denied the appellant's motion to suppress with the following comments:
"All right. On the motion to suppress, I think with some explanation [the additional testimony] helped and then it didn't help.... But I will say to you that what I had ruled before was that the testimony was in conflict about whether he [the appellant] asked for his mother or not. I now have two law enforcement officers saying he did not. He says he did. Somewhere in here his mother told someone or they called her. I don't know. But if he didn't ask for her then the rightit's his right you understand. And I do believe his rights were given to him.
"So, I'm going to deny your motion to suppress although there is general confusion about memory of where people were, where they physically were that day. I don't see anything, even in his sitting in there and falling asleep for a couple of hours [at the Police Administration Building], that would make it inadmissible. It's not that someone has coerced him, it's not that someone's done things to him while he was there. So, I don't know. Obviously, Detective Pressley's testimony is confusing because it changed a whole lot. But he was clear on the fact that he did not ever ask for his mother. And, frankly, he doesn't remember him asking for his mother the first day. Although they did go get her and did call her apparently or go by the second day. I tend to think they didn't go by the second day. I think it was a telephone call." R. 243-44.
Rule 11(A)(4), A.R.Juv.P., provides: "When [a] child is taken into custody," and "his counsel, parent, or guardian is not present, [the child] has a right to communicate with them, and that, if necessary, reasonable means will be provided for him to do so." In E.C. v. State, 623 So.2d 364 (Ala.Cr.App. 1992), this Court recently addressed the issue of a juvenile's right to communicate with his parent prior to custodial interrogation by a law enforcement officer.
"The legal principles applicable to the fourth warning (right to communicate with parent) are the same as those applicable to the first three warnings (right to silence and to counsel). See Ex parte Whisenant, 466 So.2d [1006, 1007 (Ala.1985)]. See also Atchison v. State, 565 So.2d 1186,1188 (Ala.Cr.App.1990) (referring to the rights enumerated in Rule 11 as `super-Miranda rights'). `[E]ach of the four requisites [in Rule 11(A)] stands on the same footing.' Ex parte Whisenant, 466 So.2d at 1007. There is no `rational basis for distinguishing the treatment of th[e] fourth warning from that accorded the first three.' Id.

"Invocation of the juvenile right to parental communication is governed by the same standard as invocation of the Miranda right to counsel. See L.J.V. v. State, 545 So.2d 240 (Ala.Cr.App.1989). `Analogously to the right to see counsel, if a juvenile indicates, in any manner, that he wishes to talk to a parent, the interrogation must immediately cease.' L.J.V. v. State, 545 So.2d at 245. See also Smith v. State, 484 So.2d 560, 561 (Ala.Cr.App. 1986).
"....
"`The rationale of courts holding a child's request to see a parent equivalent to a request to see an attorney, ... is that, while an adult in trouble normally *60 requests an attorney's assistance, a child logically expresses his desire for help and his unwillingness to proceed alone by requesting a parent's presence.... [I]n the case of a child, the right to assistance of counsel is hollow unless a parent is present, for a parent is normally the child's only avenue through which to evaluate and exercise the right to counsel.'
"[Samuel M. Davis, Rights of Juveniles § 3.13 at 3-64.5 (2d ed 1991)]."
E.C., 623 So.2d at 367-68.
Applying those principles to this case and based on the conflicting evidence of voluntariness presented in the record, we find that the juvenile court judge did not abuse her discretion in determining that the appellant's statements were voluntary and admissible.
"`The State has the burden of proving that the defendant's confession was voluntary. Whether a confession is voluntary is determined by an examination of the totality of the circumstances surrounding the giving of the confession.' Carden v. State, 612 So.2d 506, 508 (Ala.1992). `It is well settled in this Court that "[e]xtrajudicial confessions are prima facie involuntary and inadmissible, and [that] the burden is on the State to prove that the confession was made voluntarily." Ex parte Callahan, 471 So.2d 463, 464 (Ala.1985).' Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, [___] U.S. [____], 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). `When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be manifestly contrary to the great weight of the evidence."` Ex parte Matthews, 601 So.2d at 53. See also Ex parte Woods, 592 So.2d 636, 637-38 (Ala.1991). `"`Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence.'"' Dixon v. State, 588 So.2d 903, 908 (Ala.1991), cert. denied, [___] U.S. [___], 112 S.Ct. 904, 116 L.Ed.2d 805 (1992).
"`In weighing the evidence of voluntariness and involuntariness, the trial judge was presented with a question of credibility. Player v. State, 421 So.2d 1338, 1343 (Ala.Cr.App.1982). "Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment." Williams v. State, 461 So.2d 834, 838 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala.1984).'"
Thomas v. State, 625 So.2d 1174, 1176-77 (Ala.Cr.App.1993).
"When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible, his decision will not be disturbed on appeal `unless found to be manifestly contrary to the great weight of the evidence.' Williams v. State, 456 So.2d 852, 855 (Ala.Crim.App.1984)."
Ex parte Matthews, 601 So.2d 52, 53 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See also Dixon v. State, 588 So.2d 903, 908 (Ala.1991), cert. denied, 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992) ("unless palpably contrary to the weight of the evidence"). The trial court's finding of voluntariness "will not be disturbed on appeal unless it appears contrary to the great weight of the evidence, or is manifestly wrong." Ex parte Williams, 627 So.2d 999, 1002 (Ala.1993) (quoting Jackson v. State, 516 So.2d 726, 741 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala.1986)), cert. denied, ___ U.S. ___, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
"The standards for appellate review of a trial judge's determination of the admissibility of a confession are as follows: (1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) `The admissibility of confessions is for the court, their credibility *61 is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977), and cases cited therein. `Review of the court's action is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir.1978)."
Williams v. State, 461 So.2d 834, 838 (Ala.Cr. App.1983), reversed on other grounds, 461 So.2d 852 (Ala.1984).
Here, the juvenile court judge's determination of voluntariness was not against the great weight of the evidence.
"`Absent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court.' Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App. 1989). The standard on review of conflicting evidence at a motion to suppress a confession is whether the trial court's finding was `manifestly contrary to the great weight of the evidence.' Ex Parte Matthews, 601 So.2d 52 (Ala.1992), cert. denied, [___] U.S. [___], 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See also Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985) (whether the finding was `palpably contrary to the weight of the evidence')."
Thompson v. State, 611 So.2d 476, 478 (Ala. Cr.App.1992).
In reaching this determination, we have also considered the appellant's allegation that the police violated Ala.Code 1975, § 12-15-58(a)(3), by keeping the appellant at the Police Administration Building for "a long period of time" on September 28, 1993, before taking him to the juvenile detention facility. There is no contention that any interrogation of the appellant lasted for any substantial period of time.
Although the testimony is confusing in regard to the exact period of time the appellant was detained by the police, it appears that the police arrested the appellant at Phillips High School on the morning of September 28, 1993, during school hours. It also appears that the appellant was then taken to the Police Administration Building, where he was detained while the investigating officers attended the victim's funeral, which was at noon. The appellant signed a written waiver of rights form at 2:25 that afternoon. His tape-recorded statement began at 2:30 and ended at 2:43 that same afternoon. C.R. 35, 36, 41. The arrest report reflects that the appellant was placed under arrest at 3:30 that same afternoon and was "transported to juvenile." C.R. 1, 2. The record shows that the appellant was "taken into custody and placed in detention care at the Jefferson County Youth Detention Center ... on September 28, 1993 at 04:15 P.M." C.R. 14.
Section 12-15-58(a)(3) states: "A person taking a child into custody shall, with all possible speed, ... [b]ring the child, if not released, to the intake office of probation services or deliver the child to a place of detention...."
"`[N]othing in Code 1975, § 12-15-58 et seq., precludes the transport of an arrested juvenile to a police department first before transfer to a juvenile facility.' Ex parte Talley, 483 So.2d 1372 (Ala.1986). `Alabama has no prohibition against a law enforcement officer arresting a juvenile for a delinquent act and taking the juvenile to the police station before the juvenile is either released or taken to probation services or an authorized detention facility.' Talley v. State, 483 So.2d 1369, 1371 (Ala. *62 Cr.App.1985), cert. quashed, Ex parte Talley, 483 So.2d 1372 (Ala.1986). `We do not think that the purpose of the "with all possible speed" requirement of Section 12-15-58 is to immunize juveniles from police investigation and interrogation or erect a shield between minors and law enforcement officers.' Whisenant [v. State], 466 So.2d 995, 1005 (Ala.Cr.App.1984), reversed on other grounds, 466 So.2d 1006 (Ala.1985)]."
Chambers v. State, 497 So.2d 607, 610 (Ala. Cr.App.1986).

II
The appellant argues that the evidence is insufficient to support the juvenile court's finding of probable cause that he committed the charged crime. This argument is based on the contentions that the appellant's statement was inadmissible and that the State's witness was not credible.
In the order of transfer, the juvenile court stated:
"The Court having heard the sworn testimony taken in open court including that of Mimi Moorer, (Rosie Moore, [D.M.M.], James Dillworth, Andre Pressley for purposes of voir dire only) Derrick Sales, Kelan Daniel as to probable cause finds that the State has established probable cause by sufficient evidence to show that said child did on or about September 22, 1993, in the Birmingham Division of Jefferson County, Alabama the said child, did intentionally cause the death of Corey Denson by shooting him with an SKS Assault Rifle while Corey Denson was in a motor vehicle and child was outside that motor vehicle, in violation of Section 13A-5-40(a)(17) of the Alabama Criminal Code against the peace and dignity of the State of Alabama as alleged in the petition...." C.R. 46.
In Part I of this opinion, we determined that the appellant's inculpatory statement was properly admitted into evidence at the transfer hearing. In that statement to the police on September 28, 1993, the appellant claimed that he accidentally shot the car in which Denson was riding. However, at the transfer hearing, Derrick Sales testified that he saw the appellant aiming and shooting the rifle at the car. R. 266-67. He testified that the appellant fired "about six, seven, eight" times, and that the first shot hit the ground around his [Sales] feet. R. 285-86. Sales stated that 15 to 20 minutes after the shooting the appellant told him, "[O]h, Lord, man, I done killed the boy." R. 268. Sales testified that later that same night he overheard the appellant tell his brother, Jahara Sales, "I told you, nigger, about fucking with ATO." R. 270.
"[A] transfer hearing is not a hearing to adjudicate the guilt or innocence of the child accused of a crime but is, instead, a probable cause hearing to determine whether the child should be transferred out of the juvenile court for criminal prosecution as an adult." Brown v. State, 353 So.2d 1384, 1387-88 (Ala.1977). At the probable cause phase of a juvenile transfer hearing, the juvenile court must find that "a reasonable man would believe the crime occurred and that the defendant committed it." Duncan v. State, 394 So.2d 930, 932 (Ala.1981).
"A hearing on a motion to transfer involves a probable cause hearing. Duncan [v. State], 394 So.2d 930, 932 (Ala.1981)]. `Such a hearing is not designed to determine the guilt or innocence of the child accused of the crime, but is instead a hearing to determine whether the child should be transferred out of the juvenile court for criminal prosecution as an adult.' Duncan, 394 So.2d at 932. For this reason, the strict standard of proof beyond a reasonable doubt does not apply. Brown v. State, 353 So.2d 1384 (Ala.1987). `The only standard which must be met is whether a reasonable man would believe the crime occurred and that the defendant committed it.' Duncan, 394 So.2d at 932."
Ash v. State, 424 So.2d 1381, 1382-83 (Ala.Cr. App.1982).
Here, the evidence supports the finding of the juvenile court that there was probable cause to believe that the appellant committed the charged criminal offense.

III
The appellant also argues that the evidence does not support the finding of the *63 juvenile court at the dispositional phase of his transfer hearing. He contends that "there was nothing in his background or behavior that would support treating [him] as an adult." Appellant's brief at 79.
The dispositional portion of the juvenile court's written order of transfer states:
"The Court having reviewed the records and exhibits admitted in evidence, including the orders of this court, finds that said child has been referred to this court on August 27, 1992, Trespass After Warning; May 4, 1993, Trespass After Warning Violation of Probation.
"The Court having considered all of the factors contained in Section 12-15-34, Code of Alabama, 1975, including the nature of the present alleged offense; the extent and nature of the child's prior delinquency record; the nature of past treatment efforts and the nature of the child's response to such efforts; demeanor; the extent and nature of the child's physical and mental maturity; and the interests of the community and of the child requiring that the child be placed under legal restraint or discipline finds that said child is not committable to an institution or agency for the mentally retarded or mentally ill; and further finds by clear and convincing evidence presented that the best interests of the child and public would be to grant the Motion to Transfer, ..." C.R. 46.
At the conclusion of the transfer hearing, the juvenile court judge addressed each of the six statutory factors that must be considered in transferring a juvenile to circuit court for prosecution as an adult. See Ala.Code 1975, § 12-15-34(d).
"There are six factors that the Code of Alabama sets out that I must consider. They are the nature of the present offense [§ 12-15-34(d)(1)] and, of course, there is no more serious offense than capital murder or taking someone's life period especially intentionally.
"There is the extent and nature of the child's prior delinquent record [§ 12-15-34(d)(2)], which is as Mr. Morgan [defense counsel] pointed out very small. He has a trespass after warning on which he got probation and then he had a violation of probation basically from what I can glean for just failing to do anything the Court ordered him to do. I think he had a hundred hours community service. He was supposed to attend some of the classes here. There were things he was supposed to do that he just did not. Of course, neither did his family.
"The third one is the nature of past treatment efforts and the child's response [§ 12-15-34(d)(3)] and that's basically what we've just discussed.
"His demeanor [§ 12-15-34(d)(4)], which has to do with attitude. And as a court we can only see the demeanor of someone when they're in front of us but we can learn about the demeanor of people from what others says. Mr. Walker [probation officer], I think, found [D.M.M.] to be at least remorseful talking to you. And I understand what Ms. Smith [victim's mother] has said today.... I think a lot of what happened here has to do with gangs. It has to do with ATO. It has to do with children who very often lack much at home. And so they gravitate towards these groups that offer them what they lack. And that is being included and feeling important and also being safe to some extent.
"But it's an illusion. I mean, it's not real, [D.M.M.]. It's like a bad joke on you. And my bet is being young, which he's younger than these other people who were in hereI don't [know] how old Derrick Sales is but he's certainly not fourteen well, fifteen. But being young, I can just imagine you out there in that yard with that big gun. I mean, I have fired those guns at a range and I will say to you that it's a pretty powerful feeling. And it's really a way to impress your friends.
"But I can'tI don't know how to get it across to you or other young men especiallyI haven't seen any girls who are running around in this community with these guns. I know you've heard it on TV. I know you've heard it everywhere about putting them down. But I believe at least by probable cause that you have taken someone's life acting like a gangster. Maybe you are a gangster. Gangsters *64 need to be locked up. That's what I think. That's what I do do.
"And ATO, I'd say at the moment, is oneprobably the worst group going around Birmingham. I'm seeing them a lot, been seeing them a lot for a year or more. I've seen a couple of kids die at the hands of ATO. One who just happened to be in the wrong place at the wrong time. I'm not sure this was an accident at all from what I've heard. But people who stand out and fire semi-automatic weapons at automobilesI mean, what do you think is going to happen?
"The fifth on is the extent and nature of the child's physical and mental maturity [§ 12-15-34(d)(5)]. Did he not have a psychological [profile] done?
"MR. WALKER [probation officer]: No, ma'am, he did not.
"THE COURT: No. Okay. I don't know of anything that shows meI do know that [D.M.M.] has a learning disability, which certainly does not have to do with his intelligence so much as his perception of words and so forth in school. I do know [D.M.M.] has caused some problems at school but basically probably since he got to high school and found the ATOs.
"But physically [D.M.M.]well, he's fifteen years old. He's big for his age but he is fifteen and that is the one factor in this case, in my opinion, that mitigates against his transfer is he's so young.
"The last factor has to do with the interest of the community and of the child requiring that he be restrained [§ 12-15-34(d)(6)]. I don't guess I need to talk about the interest of the community. I understand what you're saying, Joe [defense counsel], but I think what it means is the interest of the community in danger, in being protected. Anyone who would stand outside with a semi-automatic weapon and just begin firing has got to be one of the most dangerous people I can think of to a community.
"I do understand, being a juvenile judge, that he's fifteen years old and he doesn't have the judgment of a twenty-one year-old who might be out there firing an automatic weapon. But I can't believe from anything that I've seen or heard here that [D.M.M.] doesn't know better than that. I mean, everything in this society, whether you live in Druitt Hills or whether you live in Forest Park or whether you live anywhere, is saying loud and clear and has been for quite a while now, that this is wrong. That it's absolutely unacceptable and I just can't believe [D.M.M.] doesn't know that.... It's in [D.M.M.'s] statement about just going out and playing with their guns and trying them out. I would believe that except that carwell, there's some testimony as to statements made earlier but also that car was right there, you know. If you're going to try out a gun with a car in front of you, I would think you would shoot it up in the air. I would say that those guns are not as easy to control as you think because I happen to have fired one. But I will say this, he's a pretty big boy. I think he was shooting at the car. I do. He may not have cared which [passenger] he hit.
"But it wouldn't have mattered to me any more than if he had shot Keelan that he shot Corey because either way it's just absolutely unforgivable. It is with some regret that I'm going to grant the State's motion. I hate these cases when these children are so young and doing this kind of thing, but I also cannot have him out killing innocent citizens on the street just, I guess, for the fun of it. That's what I think. I can't find any other reason except just to be the big guy in the group. I wish there were a way in my power to get that message across to these kids, but I cannot. I do realize that you're probably going to fact the death penalty. In hearing the evidence in this case, I think you probably will.[2]

*65 "So, we're down to bond. I have problems in this. Bond is to make sure someone appears for court. We've had problems in this case in that [D.M.M.'s] mother has been so lax in coming herself or getting him to anything he's supposed to be in or anything that II almost fear, you know, that he won't appear because he doesn't have any parental supervision. I realize, Ms. [M.], he got out of your control finally. But there are reasons for that. I'm going to set the bond at $100,000 and I thank you all." R. 339-347.
These comments by the juvenile court reflect a serious and conscientious consideration of the totality of the circumstances involved in deciding whether to order the appellant's transfer. The decision of the juvenile court is due to be upheld.
"Transfer hearings are divided into two phases, a probable cause phase and a dispositional phase. During the probable cause phase, the juvenile court determines whether there is probable cause to believe that the juvenile committed the alleged crime. During the dispositional phase, the juvenile court determines whether it is in the best interest of the child or the public to transfer the child to the circuit court to stand trial as an adult. § 12-15-34, Code of Alabama 1975. See A.M. v. State, [621] So.2d [369] (Ala.Cr.App.1992).
"`[A] transfer hearing is not a hearing to adjudicate the guilt or innocence of the accused, but instead is a probable cause hearing, to determine whether the juvenile should be transferred out of the juvenile court for prosecution as an adult.' W.M. v. State, 607 So.2d 1303, 1304-05 (Ala.Cr. App.1992). See also Ex parte W.T.K., 586 So.2d 850 (Ala.1991); Smith v. State, 475 So.2d 633 (Ala.Cr.App.1985). With respect to a finding of probable cause, the Alabama Supreme Court held in Duncan v. State, 394 So.2d 930 (Ala.1981):
"`Since the purpose of a hearing of this type is not to determine the guilt or innocence, the strict standard of proof beyond a reasonable doubt has been held not to apply. Brown [v. State], 353 So.2d 1384 (Ala.1978)]. The only standard which must be met is whether a reasonable man would believe the crime occurred and that the defendant committed it. This court has further held that we will not interfere with a lower court's order transferring a juvenile to circuit court unless that order is clearly erroneous. Williams v. State, Ala., 361 So.2d 1157 (1978).'
"Duncan, 394 So.2d at 932. (Emphasis added.) See also Slaton v. State, 555 So.2d 814 (Ala.Cr.App.1989).
"....
"The appellant also questions the court's decision, in the dispositional phase of the hearing, to transfer him to circuit court. In making its decision, the trial court must consider the factors enumerated in § 12-15-34(d), Code of Alabama 1975, which states:
"`(d) Evidence of the following and other relevant factors shall be considered in determining whether the motion shall be granted:
"`(1) The nature of the present alleged offense;
"`(2) The extent and nature of the child's prior delinquency record;
"`(3) The nature of past treatment efforts and the nature of the child's response to such efforts;
"`(4) Demeanor;
"`(5) The extent and nature of the child's physical and mental maturity; and
"`(6) The interests of the community and of the child requiring that the child be placed under legal restraint or discipline.'
"Section 12-15-34(d) compels the consideration of each of the six factors listed. Jelks v. State, 522 So.2d 11 (Ala.Cr.App. 1988). However, the weight to be given to each of those factors, in balancing the interests of the juvenile and society, is left to the discretion of the juvenile court judge.
*66 Palmer v. State, 485 So.2d 1247 (Ala.Cr. App.1986).
"`[T]he weighing of the six statutory factors and other considerations in determining whether a juvenile should be transferred from the juvenile court to the circuit court for criminal prosecution as an adult does not involve "a mere tallying of the circumstances for the purpose of numerical comparison".... Rather, it is a balancing and weighing process wherein one statutory factor may outweigh the remaining five statutory factors.'
"N.D.T. v. State, 592 So.2d 647, 650 (Ala. Cr.App.1991). The juvenile court need not make a specific finding as to each of the six factors to be considered under § 12-15-34(d), but his order must contain some statement that all the factors were considered, in order that the appellate courts can make a determination that the statutory requirements have been met. Taylor v. State, 507 So.2d 1034 (Ala.Cr.App.1987). If the transferring court states that all six factors of § 12-15-34(d) have been considered, then its order complies with the law. C.C. v. State, 586 So.2d 1018 (Ala.Cr.App. 1991).
"The dispositional phase of the transfer hearing is controlled by a more rigid `clear and convincing' standard of proof. W.T.K. v. State, 598 So.2d 33 (Ala.Cr.App.1992), cert. denied, [___] U.S. [___], 113 S.Ct. 173, 121 L.Ed.2d 120 (1992). Judge Bowen, speaking for this court in O.M. v. State, 595 So.2d 514 (Ala.Cr.App.1991), writ quashed, 595 So.2d 528 (1992), adopted the position taken by Justice Kennedy's dissenting opinion in Ex parte J.R., 582 So.2d 444 (Ala.), cert. denied, [502] U.S. [837], 112 S.Ct. 122, 116 L.E.2d 90 (1991). Justice Kennedy's dissenting opinion interpreted § 12-15-34, Code of Alabama 1975, to require `clear and convincing evidence' to support the transfer of a juvenile to circuit court for prosecution as an adult. The dissenting opinion stated:
"`[A]n appellate court must find, within the record, clear and convincing evidence in order to affirm a juvenile court's determination at the disposition hearing that it is in the best interest of the child or the public to transfer the child for criminal prosecution.'
"582 So.2d at 447.
"`"Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt. Addington v. Texas, 441 U.S. 418, 423-24, 99 S.Ct. 1804, 1807-08, 60 L.Ed.2d 323 (1979)." Matter of K.A., 484 A.2d 992, 995 (D.C.App.1984). See generally 9 J. Wigmore, Evidence § 2498 (Chadbourn rev. 1981); E. Cleary, McCormick on Evidence § 340 (3d ed. 1984); 32A C.J.S. Evidence § 1023 (1964). The standard has been explained as that evidence that convinces the trier of fact that a proposition is "highly probable," as distinguished from "more probable than not." McBaine, Burden of Proof: Degrees of Belief, 32 Calif.L.Rev. 242, 253-54 (1944).'
"D.D.P. v. State, 595 So.2d 528, 538 (Ala. Cr.App.1991)."
J.S.A. v. State, 615 So.2d 1288, 1290-91 (Ala. Cr.App.1993). See also A.D.T. v. State, 630 So.2d 165, 166 (Ala.Cr.App.1993).
"There is no requirement that the transferring court make a specific finding on each of the six factors to be considered under § 12-15-34(d), only that the order contain some statement that those factors were considered in order that the appellate courts can make a determination that the requirements of the statute have been met....
"This court has previously held that a transfer order containing a mere restatement of the factors set out in the statute is valid."
Mayne v. State, 416 So.2d 741, 742 (Ala. 1982). See also Taylor v. State, 507 So.2d 1034, 1037 (Ala.Cr.App.1987). The order in this case meets all the statutory requirements and reflects that all the statutory factors were considered. The record affirmatively supports that finding.
The judgment of the juvenile court ordering the transfer of the appellant is supported by clear and convincing evidence. Accordingly, *67 the judgment of the juvenile court is affirmed.
AFFIRMED.
All Judges concur.
NOTES
[1] Rule 52, A.R.App.P., provides in pertinent part: "In any case involving a juvenile who has been the subject of a proceeding in the juvenile court system, ... the appellate court shall make reasonable efforts to preserve the anonymity of such a person. This anonymity shall be observed in the body of any opinion and in the styling of the case...."
[2] In Flowers v. State, 586 So.2d 978, 990 (Ala.Cr. App.), cert. denied, 596 So.2d 954 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992), this Court applied the case of Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), and vacated a death sentence imposed upon a defendant who was 15 years' old at the time of the crime "because it violates the Eighth Amendment's prohibition against cruel and unusual punishment." See also Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Although this Court set aside the defendant's sentence of death, it ordered the circuit court to resentence the defendant to life [imprisonment] without the possibility of parole. Flowers, 586 So.2d at 991.